EDWARD H. LIGHT, Petitioner v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Light v. Commissioner
Docket No. 1950-85.
United States Tax Court
T.C. Memo 1987-572; 1987 Tax Ct. Memo LEXIS 572; 54 T.C.M. (CCH) 1102; T.C.M. (RIA) 87572; November 16, 1987. *572 Respondent used the net worth plus expenditures method of income reconstruction to determine that petitioner had unreported taxable income for each of the years at issue. Respondent also determined that petitioner's failure to report the income was due to fraud. Held, petitioner had unreported taxable income for each of the years at issue. Held further, petitioner's failure to report that income was due to fraud, and consequently, petitioner is liable for an addition to tax for fraud under sec. 6653(b), I.R.C. 1954, for each year at issue. Michael L. Scales, for the petitioner. Clare J. Brooks, for the respondent. STERRETT
MEMORANDUM FINDINGS OF FACT AND OPINION STERRETT, Chief Judge: By notice of deficiency dated November 8, 1984, respondent determined deficiencies in and additions to petitioner's Federal income taxes as follows: Addition to Tax under
Year
Deficiency
Section 6653(b) [1]
1979
$ 12,293.56
$  6,146.78
1980
22,075.90
11,037.95
1981
17,968.89
8,984.44
After concessions, *573 the issues for decision are: (1) whether petitioner had unreported taxable income as determined by respondent in any of the years at issue; and (2) whether petitioner is liable for an addition to tax under section 6653(b) in any of the years at issue. FINDINGS OF FACT Some of the facts have been stipulated and are so found. The stipulation of facts and the exhibits attached thereto are incorporated hereby in this reference. Petitioner, Edward H. Light, resided in Martinsburg, West Virginia, at the time he filed his petition in this case. He timely filed his Federal income tax returns for the years at issue with the Office of the Internal Revenue Services in Memphis, Tennessee. During the years at issue, petitioner lived with his friend, Linda K. Butts, and their three children. Petitioner was only 6 years old when he started working and, although he had only a sixth grade education, he possessed what some might term, "street smarts." Over the years, he engaged in various self-employed ventures, such as a salvage yard that he operated from 1961 to 1966, and a service station that he operated from 1967 to 1972. Despite his substantial work experience, however, petitioner's Social *574 Security records for the years 1937 through 1970 indicated that he earned very little income. [2]
Beginning in 1972 and continuing through the years at issue, petitioner owned and operated "Ed Light's Discount Store" in downtown Martinsburg. [3] In his store, petitioner stocked adult books and films, sexually oriented items, and various paraphernalia associated with smoking and using illegal drugs. [4] *575 Petitioner had the only store of its kind in Martinsburg, generally had few customers, and always managed the store by himself. When operating his store, petitioner dealt almost exclusively in cash. He transacted most of his business with vendors late at night and in cash and refused most personal checks from customers. Petitioner had no business checking account, but maintained a personal checking account with Citizens National Bank in Martinsburg ("Citizens). During the years at issue, he periodically deposited lump sums of cash to replenish the account and wrote numerous checks from the account to pay for various taxes and other store-related items. To account for daily store operations, petitioner rang up customer sales on a cash register and placed those vendor invoices that he paid on a clipboard. In total, petitioner's business records consisted of cancelled personal checks, bank deposit slips, vendor invoices and cash register tapes. To obtain a set of books, petitioner regularly sent the register tapes and the vendor invoices to a bookkeeping service. A bookkeeper took what he received from petitioner and constructed a general ledger and a set of periodic, unaudited profit and loss statements and also prepared petitioner's Federal income tax returns *576 for the years at issue. Petitioner thereby obtained a set of books and tax returns that generally reflected the information that he supplied on the tapes and adjusted gross income for the years at issue in the amounts listed in Table 1. [5]
Table 1
Gross Receipts
Adjusted
Year
From Sales
Gross Income
1979
$ 41,693
$  9,870
1980
47,776
27,505
1981
37,185
26,545
Starting in 1971 and continuing through the years in issue, petitioner purchased a number of certificates of deposit ("CD's") from Citizens. Prior to purchasing his first CD, he filled out a financial statement in May of 1971 on a form supplied by Citizens, listing a balance of $ 30,000 as his "cash in bank." Seven days later, he wrote a check to Citizens for $ 7,500 to purchase his first CD. In 1975, he paid $ 30,000 to Citizens for a CD maturing in 4 years and, during the years at issue, purchased additional *577 CD's such that he held CD's totaling, in the aggregate, the yearend values listed in Table 2. Table 2
12/31/78
$  30,000
12/31/79
100,000
12/31/80
100,000
12/31/81
150,000
Other than investing in CD's, petitioner owned an investment mutual fund worth $ 17,091.37 on December 31, 19878, but in 1979, he divested his ownership in that fund. Petitioner also spent and received cash during the years at issue as follows: a. In 1979, petitioner bought the business building and land where he operated "Ed Light's Discount Store," using a $ 20,000 money order. b. In 1980, petitioner sold his mobile home for $ 2,800 in cash. He originally paid $ 2,400 for the mobile home in 1972, and prior to the years at issue, spent $ 435 on the home for a roof, sink, underpinnings and water and drain lines. c. Shortly after selling his mobile home in 1980, petitioner purchased as house for $ 55,000. He paid $ 5,000 in cash as a downpayment and borrowed the balance of the purchase price, $ 50,000 from Citizens. As collateral, he posted a $ 100,000 CD from Citizens. Four months after taking out the loan, he paid $ 51,916.67 to Citizens, representing $ 50,000 of principal and $ 1,916.67 of accrued interest, and *578 later paid $ 3,900 in cash in 1981 for a concrete driveway for the house. d. In 1980, petitioner purchased a 1929 Model A Ford automobile for $ 9,000 in cash. Also, he spent a total of $ 799 in 1980 on a television set and a bedroom suite and, during the years at issue, increased the total value of his furniture, fixtures and dogs from $ 1,000 on December 31, 1978, to $ 1,200, $ 2,564 and $ 3,236 at the end of 1979, 1980 and 1981, respectively. e. In 1981, petitioner sold his 1970 Cadillac limousine for $ 3,500 in cash. Petitioner originally paid $ 3,000 for the limousine in 1977 and, during 1980, spent $ 633.80 on the limousine for an exhaust system, four tires and a battery. f. Petitioner received Federal income tax refunds in 1979 totaling $ 1,296.85 for the taxable years 1977 and 1978 and wrote checks for Federal income taxes for $ 3,456 in 1979, $ 834 in 1980 and $ 5,576 in 1981, for the taxable years 1978, 1979, and 1980, respectively. Respondent's agents first met with petitioner on March 17, 1982, in his store. The agents informed petitioner that he was the subject of a criminal investigation, then began the first of approximately 15 to 20 meetings and interviews with *579 petitioner. [6] At this initial interview, the agents asked petitioner several questions about his "cash on hand," asking whether he knew the meaning of the term and explaining that it did not include any cash that he had in banks. Petitioner responded that he had $ 60,000 of "cash on hand" in 1975, from which he used $ 30,000 to purchased the 4-year CD from Citizens. Petitioner also told the agents that he did not have more than $ 10,000 on hand at the close of 1979, 1980 or 1981. On several occasions after the initial interview, petitioner repeated his initial claim of having $ 60,000 cash on hand. One week after the initial interview, however, petitioner altered the claim be asserting that he once had $ 16,000 of cash in a bag in the trunk of one of his cars. Later, petitioner told the agents of once keeping $ 30,000 in cash in a steel box in a Datsun. Petitioner did not mention either the bag or the box in the initial interview. Petitioner once again *580 modified his initial claim during a meeting with the agents in May of 1982, after they told him that his 1980 expenditures exceed his total claims to cash on hand. In the meeting, petitioner told the agents for the first time about a $ 45,000 cash hoard that allegedly he had saved to buy a house. Petitioner claimed that he kept this particular hoard in two foil-lined and fire-resistent bags, marking one bag, "save for home," and the other bag, "30,000 [+] 30,000 [=] 60,000." The agents told petitioner that even with an extra $ 45,000 in cash, his 1981 expenditures still exceeded his aggregate claims to cash on hand. Petitioner then claimed for the first time that on a Sunday afternoon in July of 1973, his grandfather, whom he called "Pap," gave him a burlap bag filled with $ 75,000 in cash. [7] *581 Petitioner told the agents in the initial interview that he never received any gifts. Now, to support his story of a $ 75,000 gift, petitioner told the agents: (1) that he promised "Pap" not to tell anyone about the gift; and (2) that he received instructions from "Pap" to make interest-free loans to family members needing cash. Petitioner never made any loans to family members, and no one witnessed the alleged gift from "Pap." Nevertheless, petitioner attempted to persuade the agents that his gift story was true. From the May meeting, petitioner went with the agents to his store, where petitioner showed them a burlap bag that he insisted was the gift bag. The next day, petitioner showed the agents a small receipt from petitioner's old service station, on which he had listed descriptions of 36 bundles of cash in the following manner: Eleven piles of $ 20.00 bills
($ 5,000.00 each pile)
$ 55,000
Fifteen piles of $ 10.00 bills
($ 1,000.00 each pile)
15,000
Ten piles of $ 5.00 bills
($ 500.00 each pile)
5,000
$ 75,000
Sometime before producing the receipt, petitioner *582 had dated it "July [19]73," and had written "Good old Pap" next to the total of $ 75,000. However, respondent's forensic experts were unable to establish when petitioner actually prepared the receipt. In addition to the bag and the receipt, petitioner showed the agents two pieces of United States currency, both bearing petitioner's notation, "Gift from Pap July 1973." One piece of currency as a $ 20 bill imprinted with the word "Hawaii," and the other was a $ 10 Federal reserve bank note. Petitioner told the agents that the bills came from the bundles of cash in the burlap bag. To perform a test, respondent's agents took petitioner's burlap bag to a bank in Martinsburg. At the bank, they tried to stuff the bag with bundles of bills packaged similarly in quantity and size to the bundles that petitioner specified on the "Good old Pap" receipt. No one, including bank personnel, could fit all 36 test bundles in the bag at one time. The agents relied on petitioner's statements from the initial interview, rather than his subsequent modifications, to derive the balances for petitioner's cash on hand in the years at issue. They combined those balances with the adjusted bases of petitioner's *583 other assets and liabilities, then reconstructed petitioner's taxable income using a net worth plus expenditures analysis. [8] To document their analysis, the agents compiled a schedule determining petitioner's unreported taxable income, as set forth in Table 3. Table 3
NET WORTH COMPUTATION FOR EDWARD H. LIGHT
Assets
12/31/78
12/31/79
12/31/80
12/31/81
Cash on hand
[1] *584 $ 44,798.65
$ 10,000.00
$ 10,000.00
$ 10,000.00
Cash - Checking
Accounts
75.63
187.12
367.81
[7] 709.38
Cash - Certif.
30,000.00
100,000.00
100,000.00
150,000.00
Inventory
8,595.00
9,455.00
9,550.00
9,250.00
Personal Resid.
2,400.00
2,400.00
55,000.00
55,000.00
Business
Bldg./Land
-0-
20,000.00
20,000.00
20,000.00
Furniture/
Fixtures/Dogs
1,000.00
1,200.00
2,564.00
3,236.00
Personal Autos
11,650.00
11,650.00
20,950.00
19,000.00
Improvements -
Residence
-0-
-0-
-0-
[8] 3,900.00
Mutual Investment
Fund
17,091.37
-0-
-0-
-0-
Total Assets
$ 115,610.65
$ 154,892.12
$ 218,431.81
$ 271,095.38
Liabilities
Accumulated
Depreciation
683.00
[2] 1,148.26
[2] 1,874.26
[2] 2,758.26
Net Worth
$ 114,927.65
$ 153.743.86
$ 216,557.55
$ 268,337.12
Less:
Beginning
Net worth
114,927.65
153,743.86
216,557.55
Increase in
Net Worth
38,816.21
62,813.69
51,779.57
Adjustments to Increase Net Worth
Personal Living Expense
3,000.00
7,117.00
5,200.00
Federal Taxes Paid
3,456.00
834.00
5,576.00
Furniture Purchases for Residence
[5] 799.00
Adjustments to Decrease Net Worth
[3] (1,296.85)
[6] (400.00)
[9] (900.00)
[4] (100.00)
Corrected Adjusted Gross Income
43,875.36
71,163.69
61,655.57
AGI Per Return
9,870.00
27,505.00
26,545.00
Adjustment
34,005.36
43,658.69
35,110.57
Adjustments to Arrive at
Taxable Income  Excess Itemized Deductions
37.67
In his notice of deficiency, respondent used the net worth plus expenditures method of income reconstruction to determine that petitioner has unreported taxable income in the amounts of $ 34,005.36 in 1979, $ 43,658.69 in 1980, and $ 35,110.57 in 1981. Respondent also determined that petitioner was liable in each year at issue for an addition to tax for fraud under section 6653(b). OPINION We must decide: (1) whether petitioner had unreported taxable income, *585 as determined by respondent, in any of the years at issue; and (2) whether petitioner is liable for an addition to tax for fraud under section 6653(b) for any of the years at issue. For the reasons set forth below, we hold for respondent on both of these issues. Unreported Taxable Income
Respondent relied on the net worth plus expenditures method in determining that petitioner had unreported taxable income in each of the years at issue. Petitioner bears the burden of proving that respondent's net worth computations in this regard are erroneous. Rule 142(a); Welch v. Helvering,290 U.S. 111, 115 (1933). Petitioner presents two basic arguments with respect to respondent's determinations of unreported taxable income. First, petitioner asserts that his books and records, and not the net worth plus expenditures method, control in determining his taxable income. Second, petitioner asserts that respondent erred in determining beginning and ending values and bases of certain items affecting respondent's net worth computations. Books and Records. The United States Supreme Court generally sanctions the use of net worth methods of indirect proof to establish unreported taxable income. See Holland v. United States,348 U.S. 121 (1954); *586 Lipsitz v. Commissioner,21 T.C. 917 (1954), affd. 220 F.2d 871 (4th Cir. 1955). Petitioner argues that, in the present case, respondent's use of the net worth plus expenditures method is improper. Petitioner reasons that he had an accurate and complete set of books and records and that we must accept them as clearly reflecting his taxable income. Petitioner's argument is without merit. Respondent's agents conceded at trial that petitioner's income tax returns reflected the information contained in petitioner's books and records. Even if petitioner's books and records appear perfectly adequate, respondent may test the adequacy of the information contained thereby by any reasonable method which, in respondent's judgment, properly reflects petitioner's taxable income. See Holland v. United States, supra at 131-132; Lipsitz v. Commissioner,21 T.C. at 931. In this case, respondent chose the net worth plus expenditures method to reconstruct petitioner's income. Respondent had evidence of increases in petitioner's net worth exceeding the income that petitioner reported on his tax returns, including evidence of his CD purchases and his acquisitions of a house, cars and other items. *587 Considering that evidence, we are not persuaded that respondent's choice of methods was improper. Consequently, we reject petitioner's argument that his books and records control in this case. Net Worth Items.Petitioner challenges the values assigned by respondent's agents to certain items in petitioner's opening net worth, the starting point for calculating subsequent increases or decreases in his net worth, as well as certain yearend asset values, the reference points for calculating net worth increases or decreases from year to year, and for calculating gains or losses on the sales of assets. Accurate determinations by respondent of the values for these items are critical in properly reconstructing petitioner's taxable income by the net worth plus expenditures method. See Holland v. United States, supra;United States v. Massei,355 U.S. 595 (1958). In challenging respondent's determinations for these items, petitioner relied in large part on his own testimony. As a witness, he simply was not credible. With this initial observation, we examine each item in the net worth calculations that petitioner challenges, starting with his claims to possessing various cash hoards. 1. *588 Cash on Hand Balances. Petitioner contends that he possessed various cash hoards on December 31, 1978, the beginning date used by respondent in determining an increase in petitioner's 1979 net worth. Petitioner contends that he possessed a greater opening balance of cash on hand than the balance of $ 60,000 that respondent used in the net worth computations.[9] Petitioner's claim is hardly without precedent. "A favorite defense in net worth cases is that [the] taxpayer had a large amount of undeposited cash on hand at the beginning of the investigation period. This may explain the disproportionate increases in net worth over the increase of taxable income." Schwarzkopf v. Commissioner,246 F.2d 731, 734 (3d Cir. 1957), affg. in part a Memorandum Opinion of this Court; see also Holland v. United States, supra at 127. *589 Petitioner gave respondent's agents various accounts of his cash on hand balances and asks us to accept that he possessed the following amounts: Briefcase of cash from
savings prior to 1979 [10]
$ 100,000
Cash on person [10]
1,500
Gift from "Pap" of cash in burlap
bag in July of 1973
75,000
Total purported cash hoard
("cash on hand"), 12/31/78
$ 176,500
Add: Cash in bank
30,000
Total cash, 12/31/78
$ 206,500
Respondent apparently concedes that, if petitioner had $ 176,500 in cash on hand on December 31, 1978, petitioner would not have any unreported taxable income in any of the years at issue. Upon careful consideration, we reject each component that petitioner claims in his total of $ 176,500 of cash on hand for the simple reason that we do not believe him. We had ample opportunity to observe petitioner on the witness stand to appraise his testimony in light of other evidence. We observed that petitioner is a businessman of reasonable intelligence, notwithstanding his lack of formal education. However, his stories contain many contradictions, and his testimony convinces us that he has little regard for the truth. *590 Petitioner's testimony was entirely self-serving and was inconsistent with the documented, corroborated testimony of respondent's agents. To believe petitioner's arguments, we would have to believe his testimony concerning his business dealings, his CD purchases, the nature of his business activities and business inventory, and the content of his prior statements to the agents. More credible evidence in the record contradicts that testimony. First, petitioner asks us to believe that, by working hard and living frugally, he accumulated $ 131,500 in cash from his earnings prior the tax years at issue. [11] His reported earnings in those years do not allow any such accumulation. [12] He also argues that he had $ 131,500 in cash, but that his tax records might not reflect it because he might not have reported the cash in various years preceding the years at issue. Understandably, petitioner presents no evidence to show a prior pattern of unreported income. We need not decide whether petitioner had unreported income in prior years, because respondent seeks only to tax petitioner on income property taxable in the years at issue. See Burnet v. Sanford & Brooks Co.,282 U.S. 359 (1931). Instead, *591 we find that his claims of frugal savings are unbelievable and that his arguments concerning his alleged accumulations are without merit. In support of his cash hoard claims, petitioner called various witnesses to testify that they often saw him with substantial amounts of cash. One of these witnesses was petitioner's brother, Larry Light, who testified that he saw petitioner with cash in the trunk of a car. However, Larry did not count the money or know its exact amount. Other witnesses *592 in addition to Larry testified that they saw petitioner with cash, but none of these witnesses testified to a sum certain and certainly not to $ 131,500. On the record before us, we cannot conclude that petitioner had a $ 131,500 cash hoard. Petitioner also asks us to accept his story that his grandfather, "Pap," gave him $ 75,000 in cash. In the initial interview, petitioner told the agents that he had not received received any gifts. [13] *593 The "gift" claim [14] also blatantly contradicts the testimony of several witnesses who testified that "Pap" lacked the financial capability to give anyone, including petitioner, $ 75,000 in cash and who contradicted one of petitioner's arguments explaining the gift, that he was "Pap's" favorite grandchild. In addition, petitioner presented no evidence of any action inconsistent with his story, such as making loans with the purported gift proceeds. The only physical evidence that petitioner presented in support of his gift story was the burlap bag, a self-serving receipt that he authored, and two old pieces of currency that he alleged were in the bag. The record contains evidence that the bag was too small for all of the bundles of cash that petitioner listed on the receipt. Petitioner's evidence strains credulity and does not prove either a gift or the existence of a $ 75,000 cash hoard. Petitioner apparently asserts that he possessed various cash hoards in order to explain certain purchases of assets that increased his net worth during the years at issue. See, e.g., Friedman v. Commissioner,421 F.2d 658 (6th Cir. 1970), affg. a Memorandum Opinion of this Court. Petitioner presented no reasonable explanations for his purchases and effectively testified that he did not deplete his purported cash hoards. His testimony does *594 not persuade us that he acquired assets with cash hoards, but instead persuades us that he fabricated his stories. Petitioner failed to prove that his cash-on-hand balances were other than the balances that respondent used to reconstruct petitioner's taxable income. On the record before us, we have no difficulty sustaining respondent's determinations of petitioner's beginning and ending cash-on-hand balances. [15]
2. Other Items. Petitioner takes exception to the bases that respondent assigned to two assets in the net worth statement. First, petitioner claims that his payments for an exhaust system, four tires and a battery increased the basis in one of his Cadillacs from $ 3,000 to $ 3,633.80. Second, petitioner claims that his payments for a drain, sink, roof and water lines increased the basis in his mobile home from $ 2,400 to $ 2,835. Petitioner made the Cadillac expenditures during one of the years at issue, 1980, but made the mobile home expenditures prior to the years at issue. In both *595 instances, petitioner claims that the bases, as adjusted, exceeded amounts that he realized on subsequent sales of the assets during the years at issue and argues that respondent incorrectly determined unreported taxable income by using lower, unadjusted bases for determining gains on those sales. The basis adjustments that petitioner asserts for his Cadillac expenditures are without merit. Petitioner's expenditures for an exhaust system, four tires and a battery constitutes ordinary repairs and do not affect his basis. Secs. 162, 263; secs. 1.263(a)-1(b), 1.162-4, Income Tax Regs. We note, however, that respondent used the amount shown on petitioner's certificate of title, $ 2,000, as the Cadillac's basis in the net worth computations. At trial, petitioner admitted that he originally paid $ 3,000 for the Cadillac, and so argues in his trial brief. We find that $ 3,000, not $ 2,000, is petitioner's proper tax cost basis for the Cadillac limousine. [16] *596 Petitioner's assertions regarding the mobile home basis are without merit. His mobile home basis had no effect on respondent's determination of petitioner's unreported taxable income in 1979, [17] or in 1980. [18] *597 We therefore need not address petitioner's assertions regarding this item. Other than by admitting that he paid $ 3,000 for one of his Cadillacs, petitioner failed to prove that respondent's net worth computations are incorrect. The evidence in the record wholly negates petitioner's claims to nontaxable or excludable sources of income. See United States v. Massei,355 U.S. 595 (1958). Accordingly, we find that petitioner had unreported taxable income in each of the years at issue, corresponding to our findings above. Fraud
Respndent imposed an addition to petitioner's tax for fraud under section 6653(b) in each year at issue. [19] Respondent has the burden of proving under section 6653(b) by clear and convincing evidence. Sec. 7454(a); Rule 142(b); Stone v. Commissioner,56 T.C. 213, 220 (1971); Otsuki v. Commissioner,53 T.C. 96, 105 (1969). Respondent *598 must establish: (1) that petitioner had an underpayment of tax; [20] and (2) that some part of the underpayment was due to fraud. Plunkett v. Commissioner,465 F.2d 299, 303 (7th Cir. 1972), affg. a Memorandum Opinion of this Court; Lee v. United States,466 F.2d 11, 16-17 (5th Cir. 1972); Otsuki v. Commissioner, supra at 105. Our other findings in this case sustain that respondent established by clear and convincing evidence that petitioner had underpayments in each of the years in issue. The remaining question for decision is whether all or part of the underpayment in each year at issue was due to fraud. The *599 existence of fraud is not a question of fact that we must resolve upon considering the entire record. Teitelbaum v. Commissioner,294 F.2d 541, 547 (7th Cir. 1961); Gajewski v. Commissioner,67 T.C. 181, 199 (1976), affd. without published opinion 578 F.2d 1383 (8th Cir. 1978); Estate of Pittard v. Commissioner,69 T.C. 391 (1977). Fraud is never presumed. Beaver v. Commissioner,55 T.C. 85, 92 (1970); Otsuki v. Commissioner, supra.Respondent must show petitioner's intent to evade taxes that he knew to be owing by demonstrating his conduct of concealing, misleading or preventing the collection of such taxes. Stoltzfus v. United States,398 F.2d 1002, 1004 (3d Cir. 1968); Webb v. Commissioner,394 F.2d 366, 377-378 (5th Cir. 1968); Webb v. Commissioner,394 F.2d 366, 377-378 (5th Cir. 1968), affg. a Memorandum Opinion of this Court; Rowlee v. Commissioner,80 T.C. 1111 (1983). Respondent rarely can show fraud by direct proof of the taxpayer's intention, but may show fraud by circumstantial evidence. Rowlee v. Commissioner, supra at 1123; Stone v. Commissioner, supra at 223-224. A pattern of underreporting income is strong evidence of fraud. Marcus v. Commissioner,70 T.C. 562, 577 (1978), *600 affd. without published opinion 621 F.2d 439 (5th Cir. 1980); see Holland v. United States,348 U.S. 121, 139 (1954); Estate of Mazzoni v. Commissioner,451 F.2d 197, 202 (3d Cir. 1971), affg. a Memorandum Opinion of this Court. Making false statements to respondent's agents, including misleading omissions, also is evidence of raud. Grosshandler v. Commissioner,75 T.C. 1, 20 (1980); United States v. Newman,468 F.2d 791, 794 (5th Cir. 1972). Making implausible or inconsistent explanations of behavior is evidence of raud, as is dealing extensively in cash or cash equivalents. See Bradford v. Commissioner,796 F.2d 303 (9th Cir. 1986), affg. a Memorandum Opinion of this Court; Gromacki v. Commissioner,361 F.2d 727 (7th Cir. 1966), affg. a Memorandum Opinion of this Court. In the present case, respondent presented clear and convincing evidence of fraud under section 6653(b) in each year at issue. Specifically, respondent proved a pattern by petition of substantially and consistently understanding his income during the years at issue, a pattern that petitioner disguised with books and records that facially reflected the taxable income that he reported on his returns. Respondent *601 also proved that petitioner made numerous misleading statements to the agents, particularly by "discovering" or "remembering" cash hoards each time the agents confronted him with his cash expenditures. In addition, petitioner acted and conducted himself in a misleading manner during the years at issue, particularly with respect to his cash transactions. Petitioner made several unexplained deposits of cash into his personal checking account, maintained no separate business checking account, and wrote numerous checks for business purposes from the personal account. He regularly purchased CD's in large amounts for his personal benefit, handled cash transactions by himself late at night, and had no plausible explanation for the whereabouts of the cash from his business. These clandestine, unexplained dealings in cash during the years at issue add greatly to the fraudulent nature of his conduct. See Gromacki v. Commissioner, supra; see Vassallo v. Commissioner,23 T.C. 656 (1955). We may infer petitioner's intent to conceal or mislead from his pattern of conduct. See Spies v. United States,317 U.S. 492, 499 (1943). In the present case, petitioner conducted himself by substantially *602 and consistently underreporting his income. In addition, the record as a whole establishes that petitioner made misleading and piecemeal statements to the agents, contradicted physical evidence with his testimony, fabricated and omitted material facts, and dealt extensively and clandestinely in cash. The circumstances of this case all combine with petitioner's pattern of conduct to show, convincingly, his fraudulent intent. [21] See Holland v. United States, supra;Otsuki v. Commissioner, supra;Schwartzkopf v. Commissioner,246 F.2d 731 (3d Cir. 1957), affg. in part a Memorandum Opinion of this Court. Respondent has carried his burden of proof with respect to fraud under section 6653(b) in each year at issue. Exposed by respondent, petitioner displayed a fabric permeated with a pattern of gross, intentional errors in each *603 of the years at issue. [22] Accordingly, petitioner is liable for an addition to tax for fraud pursuant to section 6653(b) for each of the years at issue. Decision will be entered under Rule 155.
Footnotes
1. Unless otherwise indicated, all section references are to the Internal Revenue Code of 1954, as amended and in effect during the years at issue, and all Rule references are to the Tax Court Rules of Practice and Procedure. ↩
2. Records of the Social Security Administration indicated that in the 34 year period from 1937 through 1970, petitioner earned a total of $ 30,983.47 and never earned more than $ 3,904 in any one of those years. ↩
3. In addition to operating his store, petitioner at various times acted as a source of information for the Bureau of Alcohol, Tobacco and Firearms, Department of the Treasury, concerning illegal drug transactions. ↩
4. Petitioner included in his store inventory items such as water pipes, bongs, power hitters, marijuana indoor grower lights, spoons and vials, gram scales and vials, rolling papers and roach clips. Petitioner purchased these items from vendors with names such as "Headwinds" and "High Supply." 5. The figures in Table 1 are without respect to any net operating loss carryovers, and compare to the adjusted gross income or, as indicated by parentheses, the losses that petitioner reported in certain years preceding the years at issue, as follows: ↩
1971
$  (9,644)
1975
(134)
1972
23 1976
8,126 1973
(13,808)
1977
11,935 1974
(2,458)
1978
18,662 6. Petitioner generally cooperated with the agents during the interviews. For example, he complied with their requests to inspect his books and records, and he signed waivers permitting them to speak with his accountants and doctors. ↩
7. "Pap" was Anthony William Braithwaite, a truck farmer and formerly a minimum wage earner in a West Virginia woolen mill. At best, "Pap" led a humble lifestyle, dying testate in 1975 and leaving five children, numerous grandchildren, and an estate worth $ 44,761.37. In his will, he directed his executor, Citizens, to divide his property equally among his five children. His life insurance policy paid approximately $ 700 to his son Trammel, the sole beneficiary, who distributed the money equally among the five children. 8. Basically, the agents: (1) ascertained the increases from year to year in petitioner's net worth; (2) adjusted those increases by items of nondeductible expense and nontaxable or excludable income; and (3) for each year at issue, subtracted the adjusted gross income that petitioner reported on his Federal income tax returns from his adjusted increases in net worth and determined his unreported taxable income from the differences. ↩
1. The balance represents petitioner's stated cash on hand balance of $ 60,000 in 1975, reconciled to $ 44,798.65 for receipts and disbursements made by petitioner on or before December 31, 1978. 7. Stipulated balance of $ 724.38, but by concessions adjusted to the figure of $ 709.38. ↩
8. Petitioner paid $ 3,900 for concrete driveway at personal residence. ↩
2. Accumulated depreciation, as adjusted. ↩
5. Petitioner purchased a television for $ 500 and a bedroom suite for $ 299. ↩
3. Federal income tax refunds ((1977) $ 915.20 + (1978) $ 381.65 = $ 1,296.85), interest included. ↩
6. Petitioner sold a mobile home with cost basis of $ 2,400.00 for $ 2,800.00. ↩
9. Nontaxable portion of capital gain on sale of 1970 Cadillac limousine. ↩
4. Dividend exclusion, as allowed. ↩
9. The balance of $ 60,000 is petitioner's stated cash on hand balance in 1975, and is the starting point for adjustment to $ 44,798.65 by respondent to derive petitioner's cash on hand on December 31, 1978. Petitioner apparently concedes respondent's adjustments, except for an adjustment relating to the purchase of a Cadillac limousine, discussed in the text, infra.↩
10. Petitioner raised the figures of $ 100,000 and $ 1,500 for the first time at trial.↩
11. The figure of $ 131,500 is petitioner's sum of $ 100,000 (cash in briefcase), $ 30,000 (cash in bank) and $ 1,500 (cash on person). ↩
12. etitioner started working in 1937, and in the 34 years ending in 1970, he earned $ 30,983.47. On his Federal tax returns, petitioner reported adjusted gross income of $ 23 in 1972 and reported losses in 1971, 1973, 1974 and 1975. For the 3-year period ended December 31, 1978, petitioner's total reported adjusted gross income for Federal income tax purposes was $ 38,723.48. The most frugal of the miserly could not amass $ 131,500 in cash from these sources, a conclusion similar to one reached on substantially similar facts in Iauco v. Commissioner,T.C. Memo 1982-75↩. 13. At trial, petitioner denied telling the agents that he did not receive gifts, but admitted telling the agents that he did not receive inheritances. Petitioner made his initial admissions apparently before he realized that large sources of nontaxable or excludable income would help him to explain increases in his net worth. 14. We need not decide whether petitioner actually received a "gift" for tax purposes. Cf. Commissioner v. Duberstein,363 U.S. 278↩ (1960). Rather than acknowledging petitioner's characterization of the purported transaction, we find instead that petitioner fabricated the entire story. 15. The opening cash on hand balance, however, is subject to petitioner's admission at trial concerning the amount that he paid for one of his Cadillac limousines, discussed in the text, infra.↩
16. The net worth figures for petitioner's personal autos therefore must be increased by $ 1,000 in beginning net worth on December 31, 1978, and in ending net worths for 1979 and 1980, and his cash on hand on December 31, 1978, must be decreased by $ 1,000. 17. Respondent determined unreported taxable income solely from net increases↩ in petitioner's net worth during the years at issue. Petitioner's mobile home basis either remained throughout 1979 as petitioner's original cost basis of $ 2,400, as determined by respondent, or as an adjusted basis of $ 2,835, as asserted by petitioner. In either case, the basis did not increase during 1979, and correspondingly did not affect the amount of respondent's determination of unreported taxable income in 1979. 18. Petitioner asserts that certain expenditures increased his mobile home basis from $ 2,400 to $ 2,835 and correspondingly resulted in a $ 35 loss and not a $ 400 gain when he sold the mobile home in 1980 for $ 2,800. Petitioner does not contend that he could deduct this loss of $ 35 in 1980 and does not assert that the sale of the mobile home otherwise decreased his net worth in 1980. He objects only to respondent's determination of a $ 400 gain from the unadjusted basis of $ 2,400. Respondent characterized that gain as nontaxable under section 1034 and subtracted it from the increases that he otherwise determined in petitioner's 1980 net worth. We find no merit in petitioner's objection to a gain that respondent entirely eliminated from consideration in determining unreported taxable income. 19. Section 6653(b), as in effect during the years at issue, provides in pertinent part as follows: (b) Fraud. -- If any part of any underpayment (as defined in subsection (c)) of tax required to be shown on a return is due to fraud, there shall be added to the tax an amount equal to 50 percent of the underpayment. In the case of income taxes and gift taxes, this amount shall be in lieu of any amount determined under subsection (a). * * * ↩
20. As relevant to this case, sec. 6653(c)(1) defines an "underpayment" for purposes of sec. 6653↩ as a "deficiency," defined under sec. 6211. 21. Regarding intent, petitioner argues that he conducted himself, for the most part, in a cooperative fashion during the investigation. On balance, his demeanor during the investigation does not outweigh his false claims and conduct in this case. See, e.g., Estate of Upshaw v. Commissioner,416 F.2d 737↩ (7th Cir. 1969), affg. a Memorandum Opinion of this Court. 22. In support of our findings, we note our decision in Jordan v. Commissioner,T.C. Memo. 1955-10↩, in which we stated: "In the study of the cases involving fraud, some cases seem to reek with unlawful conduct consistent only with fraudulent intent." This case falls within that category of cases.