T.C. Memo. 2014-232

UNITED STATES TAX COURT

FRANK KENNETH WORTH, a.k.a. FRANK K. WORTH, a.k.a. FRANK
WORTH AND HELEN LAURA WORTH, a.k.a. HELEN L. WORTH, a.k.a.
HELEN WORTH, ET AL.,[1] Petitioners v.
COMMISSIONER OF INTERNAL REVENUE, Respondent

Docket Nos. 12573-09, 12808-09,      Filed November 13, 2014.
              14580-09.

Edward M. Robbins, Jr., and Barbara E. Lubin, for petitioners in docket

Nos. 12573-09 and 12808-09.

Donald Kenneth Worth and Marie Ann Worth, pro se in docket No.

14580-09.

Jordan Scott Musen and Kris H. An, for respondent.

_____

[1]Cases of the following petitioners are consolidated herewith:  Frank
Kenneth Worth, a.k.a. Frank K. Worth, a.k.a. Frank Worth, docket No. 12808-09;
and Donald Kenneth Worth and Marie Ann Worth, docket No. 14580-09.

[*2]      MEMORANDUM FINDINGS OF FACT AND OPINION

LAUBER, Judge:  For the taxable years 1997-2000 the Internal Revenue Service (IRS or respondent) determined deficiencies in petitioners' Federal income tax under section 6211 and civil fraud penalties under section 6663(a).[2]  The deficiencies stem from petitioners' underreporting of income from their family business, White Sands, which comprised a group of surf and skateboard shops. White Sands was owned and operated by Donald and Marie Worth and their son, Frank Worth.

In each case respondent filed an amended answer that alleged increased deficiencies for certain years.  In docket No. 12808-09, respondent determined against Frank Worth deficiencies and fraud penalties, subsequently amended, as follows:

|  | Notice of deficiency | | As amended | |
| Year | Deficiency | Sec. 6663 | Deficiency | Sec. 6663 |
| 1998 | $63,689 | $47,767 | $73,403 | $55,052 |

---

[2]All statutory references are to the Internal Revenue Code in effect for the years in issue, and all Rule references are to the Tax Court Rules of Practice and Procedure.  We round all monetary amounts to the nearest dollar.

[*3]   In docket No. 12573-09, respondent determined against Frank and Helen Worth deficiencies and fraud penalties, subsequently amended, as follows:

|  | Notice of deficiency | | As amended | |
| Year | Deficiency | Sec. 6663 | Deficiency | Sec. 6663 |
|---|---|---|---|---|
| 1999 | $74,829 | $56,122 | $43,187 | $32,390 |
| 2000 | 99,999 | 74,999 | 171,207 | 128,405 |

In docket number 14580-09, respondent determined against Donald and Marie Worth deficiencies and fraud penalties, subsequently amended, as follows:

|  | Notice of deficiency | | As amended | |
| Year | Deficiency | Sec. 6663 | Deficiency | Sec. 6663 |
|---|---|---|---|---|
| 1997 | $97,756 | $73,317 | Conceded | Conceded |
| 1998 | 69,909 | 52,432 | $45,277 | $33,958 |
| 1999 | 62,965 | 47,234 | 75,464 | 56,598 |
| 2000 | 153,606 | 115,205 | 188,849 | 141,637 |

Respondent has conceded the deficiency and the fraud penalty as to Donald and Marie Worth for 1997.  Frank Worth has conceded the fraud penalty for all years in issue, and respondent does not contend that Helen Worth was involved with White Sands or the alleged fraud.  Because the deficiencies and the fraud penalties relate to conduct involving the White Sands business, we will generally refer to Donald, Marie, and Frank as petitioners.

[*4]    Apart from computational matters the remaining issues for decision are:  (1) whether petitioners failed to report income for 1998-2000 as determined by respondent using the net worth method of reconstructing income and (2) whether petitioners Donald and Marie Worth are liable for the fraud penalty for 1998-2000. We answer both questions in the affirmative.

FINDINGS OF FACT

Some of the facts have been stipulated and are so found.  The stipulations of facts and the attached exhibits are incorporated by this reference.  All petitioners resided in California when they petitioned this Court.

White Sands

Donald and Marie Worth were married in 1961.  After receiving their B.A. degrees, both earned master's degrees in education from Washburn University in Topeka, Kansas.  Marie was employed as a schoolteacher from 1969 through 1997; she previously held positions as an order department manager, an instructional materials clerk, a secretary, and a bookkeeper.  Donald and Marie have one son, Frank Worth, who is married to Helen Worth.

During the early 1990s Donald and Frank operated Sports Image, a sporting goods shop in Santa Maria, California.  In 1993 they converted Sports Image into a specialty skateboard and surfing store called White Sands.  By 1998 Donald and

[*5] Frank had expanded their business and operated a total of four stores in Santa Maria, Northridge, Valencia, and Ventura. During 1999-2000 they added a fifth store in Palmdale. As of April 2002 they were operating seven White Sands stores at various locations across southern California.

Because the stores were a fair distance from each other, Donald and Marie generally managed the stores nearer to them and Frank managed the stores nearer to him. Over time Frank managed about half of the stores. As manager, Frank had the authority to write checks on certain White Sands bank accounts. He wrote checks on these accounts or used cash to pay vendors for merchandise as it came in. He also wrote checks to reimburse himself for White Sands expenses that he had paid.

Frank's responsibilities included selecting shopping centers at which to open stores; managing store employees; supervising the buildout of the interior of new stores; making decisions about which brands and products to carry; managing inventory at the warehouse; and making deliveries of inventory and supplies to various stores. Frank was also responsible for collecting the daily receipts (cash, customer checks, and credit card slips) from the stores he managed and delivering them in a sealed envelope to his mother, who did the bookkeeping for White Sands.

[*6]    Petitioners used large amounts of cash in the operation of White Sands. Many customers paid in cash, and petitioners paid many vendors in cash. Marie and Donald had primary responsibility for depositing White Sands receipts. They frequently made large cash deposits spread among a dozen different bank accounts.

Petitioners had no formal arrangements concerning the ownership of White Sands during 1997-2000. They had what Donald called a "gentlemen's agreement," and the actual ownership interests were a principal focus of dispute at trial. Respondent contended that Frank should be regarded as a 50% owner of White Sands. Petitioners contended that Frank had no ownership interest in White Sands or, alternatively, that he owned only a minority stake, with the majority interest split between Donald and Marie.

Throughout White Sands' existence, Donald and Frank both held themselves out as its owners. Frank represented himself as an owner to banks, vendors, insurance companies, and the Santa Maria Police Department. Donald and Frank both negotiated and signed (jointly or separately) lease agreements for White Sands, including leases of stores and storage space. Donald, Marie, and Frank jointly filed with the State of California a fictitious business name statement for

[*7] White Sands, and they jointly, and later separately, obtained seller's permits from the State of California.

Petitioners have admitted on prior occasions that Frank was a coowner of White Sands. In a trademark infringement case filed against petitioners and White Sands in 2001 Frank averred in a filing with the California superior court that he was "a part owner in WHITE SANDS SKATE & SURF" and that Marie had no interest in the business. Later in that litigation Frank testified during a deposition that he and Donald were "partners" in White Sands. While stating that he and Donald had no formal agreement for sharing the profits from White Sands, Frank testified that they each received compensation of approximately $2,000 per month, suggesting a 50-50 ownership split.

Donald and Marie filed joint Federal income tax returns for all years in issue. On these returns they reported profits from White Sands on Schedules C, Profit or Loss From Business. For 1998 Frank filed a Federal income tax return as married filing separately, and he likewise reported profits from White Sands on a Schedule C. For 1999-2000 Frank and Helen filed joint Federal income tax returns, and they reported profits from White Sands on Schedules C. Frank and his parents obtained different employee identification numbers (EINs) for White Sands, and they used their respective EINs on their respective Schedules C. Frank

[*8] at no time reported receipt of any salary or wages from White Sands, and White Sands did not furnish him a Form W-2, Wage and Tax Statement, for any year in issue.

The evidence established that Marie prepared the original tax returns filed on behalf of all petitioners as described above. The Schedules C included in these returns assigned roughly half of the reported gross receipts and expenses of White Sands to Donald and Marie and roughly half of the reported gross receipts and expenses of White Sands to Frank, as shown in the table below:

| | Donald and Marie | | Frank | |
| Year | Gross receipts | Expenses | Gross receipts | Expenses |
| --- | --- | --- | --- | --- |
| 1998 | $259,442 | $112,525 | $285,493 | $113,167 |
| 1999 | 283,006 | 105,119 | 254,868 | 112,827 |
| 2000 | 353,247 | 124,577 | 398,841 | 177,009 |

Frank testified that White Sands was incorporated in 2002 and that Donald and Marie each were issued 50% of its stock. Apart from this testimony there is no evidence in the record that White Sands was ever incorporated or, if it was incorporated, as to who owned its stock. We did not find Frank's testimony on this point to be credible.

**[*9]** <u>Criminal Investigation</u>

In early 2001 petitioners came to the attention of Federal and State authorities because of certain banking irregularities. These included numerous deposits to multiple banks in the range of $8,000 to $9,000, slightly below the $10,000 threshold that would have required the bank to complete a currency transaction report. The case was assigned to IRS Criminal Investigation Division Agents Carol Broderick and Bonnie Decker (agents) to conduct an investigation of Donald, Marie, and Frank. During this investigation the Agents spoke with petitioners as well as with petitioners' relatives, vendors, lessors, and other third parties. During an interview with Agent Broderick, Frank admitted that he was a 50% owner of White Sands.

Donald and Marie provided inconsistent and fraudulent statements during this criminal investigation. They made inconsistent statements to the Agents concerning the ownership of the White Sands stores, and they made false statements concerning its business records. They told Agent Broderick that they could not produce White Sands' business records because the records had been stolen during a theft of merchandise. However, when California Board of Equalization (BOE) agents executed a search warrant in December 2003, they seized various items from a White Sands warehouse, including business records. The BOE search

**[*10]** revealed that Donald and Marie had custody of the business records they asserted had been stolen.

On April 11, 2007, Frank pleaded guilty to willfully making and subscribing to a false return for 2000 in violation of section 7206(1). On April 17, 2007, Donald and Marie each pleaded guilty to willfully making and subscribing to a false return for 1998 in violation of section 7206(1). In their respective plea agreements Donald, Marie, and Frank admitted that they had falsely reported their gross receipts from White Sands on their respective Schedules C and that White Sands' actual gross receipts for 1998-2000 were "substantially more" than the amounts they had reported. All three petitioners admitted that they had knowingly and willfully understated White Sands' gross receipts in an attempt to decrease their taxable income and agreed that they were "liable for the civil fraud penalty imposed by the Internal Revenue Code * * * on the understatements of tax liability for 1998, 1999, and 2000." Donald and Marie stipulated that the Government suffered a "tax loss" of $210,628 on account of their crimes; Frank stipulated that the "tax loss" attributable to his crimes was at least $50,000 and no more than $222,000.[3]

---

[3]Under the Federal sentencing guidelines the "tax loss" suffered by the Government determines the "offense level," which in turn may affect the sentence

(continued...)

**[*11]** <u>Civil Examination</u>

The IRS subsequently conducted a civil examination of petitioners' 1998-2000 returns. Because petitioners lacked complete and reliable records, the IRS had to reconstruct their incomes using an indirect method of proof. Because of petitioners' commingling of funds and extensive use of cash, the IRS was unable to isolate each petitioner's income using the "bank deposits" method. The IRS accordingly determined to reconstruct their incomes for 1998-2000 using the "net worth and personal expenditures" method (net worth method).

Revenue Agent Helen Chan had principal responsibility for this exercise. She identified the assets, liabilities, and expenses of the respective petitioners, then reconstructed their incomes for 1998-2000 by comparing changes in their net worths from one year to the next. For Donald and Marie, Agent Chan's net worth analysis was as follows:

---

[3](...continued)
received by the defendant--the higher the offense level, the longer the possible prison term. <u>See generally</u> John A. Townsend, et al., Tax Crimes 321-322 (2008). A "tax loss" of "More than $200,000" equates to an "offense level" of 18 as compared with a maximum offense level of 36 for a "tax loss" exceeding $400 million. <u>See</u> U.S. Sentencing Guidelines Manual sec. 2T4.1 (2002) (Tax Table).

| [*12]   Particulars | 1997 | 1998 | 1999 | 2000 |
|---|---|---|---|---|
| Assets | $921,860 | $1,069,027 | $1,597,367 | $2,392,822 |
| Less: Liabilities | 182,351 | 103,274 | 491,517 | 801,792 |
| Net worth | 739,509 | 965,753 | 1,105,850 | 1,591,030 |
| Less: Prior year's net worth | --- | 739,509 | 965,753 | 1,105,850 |
| Add: Nondeductible items | --- | 2,710 | 98,410 | 24,890 |
| Add: Itemized deductions | --- | 18,640 | 24,598 | 44,629 |
| Less: Nonincome items | --- | 61,713 | 3,686 | 3,000 |
| Adjusted gross income (AGI) | --- | 185,881 | 259,419 | 551,699 |
| Less: AGI reported as adjusted | --- | 57,809 | 48,123 | 83,368 |
| Additional income to report | --- | 128,072 | 211,296 | 468,331 |

For Frank, Agent Chan's net worth analysis was as follows:

| Particulars | 1997 | 1998 | 1999 | 2000 |
|---|---|---|---|---|
| Assets | $348,996 | $746,272 | $1,053,222 | $1,422,618 |
| Less: Liabilities | 115,833 | 332,734 | 546,444 | 550,052 |
| Net worth | 233,163 | 413,537 | 506,778 | 872,566 |
| Less: Prior year's net worth | --- | 233,163 | 413,537 | 506,778 |
| Add: Nondeductible items | --- | 36,415 | 81,732 | 100,889 |
| Add: Itemized deductions | --- | 17,746 | 38,143 | 34,788 |
| Less: Nonincome items | --- | 11,340 | 1,481 | -0- |
| Adjusted gross income (AGI) | --- | 223,195 | 211,634 | 501,465 |
| Less: Helen's AGI | --- | 14,062 | -0- | -0- |
| Less: AGI reported as adjusted | --- | 17,858 | 114,634 | 62,399 |
| Additional income to report | --- | 191,275 | 97,000 | 439,067 |

[*13] Agent Chan testified for nearly two days regarding the details of her net worth calculations. Her analysis required her to marshal large amounts of data--e.g., from bank and brokerage statements, canceled checks, credit card statements, real estate closing documents, and vehicle leases--and feed these data into the net worth calculus. The Court admitted her various summary charts under rule 1006 of the Federal Rule of Evidence because all entries on those charts were tied to numbers drawn from evidence in various stipulated exhibits.

Agent Chan testified as to how she had characterized certain elements of these data in some cases. For example, for a real estate closing document, she broke out separately the "cost basis" of the property, any tax-deductible items (such as real property taxes), and nondeductible items (such as prepaid insurance premiums). In those cases the Court accepted her testimony and admitted schedules of this type, not for the purpose of demonstrating the correctness of her methodology, but solely for the purpose of explaining what she had done. Petitioners had the opportunity to challenge all aspects of her methodology through cross-examination at trial and in posttrial briefs.

Agent Chan began her analysis by determining petitioners' net worths at the end of 1997. Donald and Marie asserted that Agent Chan's opening net worth figure for them was low because it did not account for a "cash hoard," namely,

[*14] cash in excess of $200,000 that they had allegedly received from Donald's father, Fred Worth. However, according to Social Security Administration (SSA) records, Fred's total income during the 40-year period ending in 1977 was $185,430. Fred started living in a federally subsidized housing unit for low-income seniors in 1985, and by 1986 his income consisted solely of Social Security and retirement payments totaling approximately $1,000 a month. Agent Chan determined that the "cash hoard" lead that petitioners suggested was not reasonable, and she did not adjust Donald and Marie's opening net worth on this account.

Petitioners also asserted that they had on hand large amounts of cash derived from White Sands' operations. Agent Chan did not dispute that assertion, but she was unable to determine exact changes in cash balances because of petitioners' incomplete records and commingling of funds. She therefore used the "floating cash" or "dash method" as approved in United States v. Giacalone, 574 F.2d 328, 333 (6th Cir. 1978). Under this formula Agent Chan assumed that the amounts of cash petitioners had on hand were relatively consistent from year to year and thus did not affect the annual change in their respective net worths.

In determining petitioners' respective assets Agent Chan identified property that included bank accounts, brokerage statements, mutual funds, real estate, vehi-

[*15] cles, and inventory. The principal uncertainty concerned how White Sands' assets should be allocated among petitioners. Agent Chan determined that 50% of its assets should be allocated to Donald and Marie and 50% to Frank. She based this allocation on (among other things) the facts that: (1) Frank and Donald held themselves out to numerous third parties as coowners of White Sands; (2) Frank and Donald admitted in civil litigation that they were coowners of (or "partners" in) White Sands; (3) Frank admitted to Agent Broderick that he was a 50% owner of White Sands; (4) Frank managed about half of the White Sands stores; (5) Frank and his parents each obtained EINs for White Sands; (6) Frank and his parents each reported shares of White Sands' profits on their respective Schedules C; and (7) the White Sands gross receipts and expenses reported on those Schedules C were divided roughly 50-50 between Frank on the one hand and Donald and Marie on the other.[4]

Frank's construction of a house in Santa Barbara during 1998-2000 evidenced significant increases to his net worth. He purchased the lot for $400,000 and tore down the existing dwelling unit. He then began construction of a 5,000-square-foot home that entailed at least $400,000 in construction costs, as

---

[4]In one instance, Agent Chan did not allocate to Frank any portion of the funds in a bank account opened in White Sands' name because he lacked signatory authority over that account.

[*16] reported to Santa Barbara County authorities. Agent Chan allocated the construction costs to tax year 1998, 1999, or 2000 primarily on the basis of invoices from contractors or similar evidence. She allocated costs for which she did not have invoices to tax year 2000, the year construction was completed. All construction costs served to increase Frank's net worth for the relevant year.

Agent Chan next determined petitioners' respective liabilities for each year. These liabilities included mortgages on real estate, credit card debt, and vehicle loans. For each year in issue Agent Chan subtracted liabilities from assets to produce closing net worth, then offset the prior year's closing net worth to produce the annual change in net worth.

The next step in Agent Chan's analysis was to "tax effect" the annual changes in net worth to produce AGI figures for each year. She therefore added "nondeductible items" and "itemized deductions" and subtracted "non-income items." For the most part "nondeductible items" consisted of personal living expenses. Such expenses must be paid from some source and, under the net worth theory, Agent Chan assumed that petitioners defrayed these expenses using unreported income. In adding back "nondeductible items" to petitioners' annual changes in net worth, Agent Chan included only those items (such as rent or car lease payments) for which she had clear evidence of the amount and purpose, as

[*17] evidenced by canceled checks, invoices, or credit card statements. For this reason her implementation of the net worth methodology consistently understated petitioners' actual personal living expenses and hence understated their AGI for each year.

For example, Agent Chan had evidence that petitioners paid residential water bills, and she included these expenses as "nondeductible items" in her calculation. However, she did not add back any other residential utility charges-- e.g., for telephone, cable, gas, or electric service--because she did not have definitive evidence of such payments. Further, although Agent Chan had bank statements for most of Donald and Marie's accounts, she had canceled checks showing the payee for only a small number of the checks that cleared these accounts. In computing "nondeductible items" she added back only those expenses for which she had a canceled check denoting a personal type of expenditure (e.g., a check payable to a pharmacy). The effect was to treat all other checks as allocable to deductible business expenditures. Similarly, Agent Chan did not add back any expenses for items like groceries, restaurant meals, clothing, or gasoline for which petitioners paid cash. In all these respects she resolved uncertainties in petitioners' favor, consistently understated their "nondeductible items," and correspondingly understated their AGI for each year in issue.

**[*18]** After adding back nondeductible expenses and petitioners' reported itemized deductions, Agent Chan subtracted "non-income items," that is, receipts from nontaxable sources. Frank asserted that certain funds he had received from his parents constituted a loan rather than a division of White Sands' profits and hence that these funds should have been treated as a "non-income item." However, Frank failed to present Agent Chan or the Court with any documentation of such a loan, any loan terms, or any proof of repayment. Without any proof that the transferred funds were nontaxable, Agent Chan declined to subtract this amount in determining Frank's AGI for the relevant year.

At this step Agent Chan also made assumptions that benefited petitioners. For example, during one year in issue, Frank sold a house and realized a gain of $60,000. Agent Chan treated this as nontaxable gain from the sale of a principal residence under section 121 and thus subtracted it when computing Frank's AGI for that year. Agent Chan later learned that the house may not in fact have qualified as Frank and Helen's principal residence at the time they sold it. Agent Chan nevertheless left this as a nontaxable item, giving them the benefit of the doubt.

Trial

Donald and Marie, who appeared pro se at trial, requested that they be allowed to present their case after respondent had put on his case. The Court

[*19] granted this request. After respondent rested, Donald and Marie decided to rest without putting on an affirmative case. The Court noted that Donald and Marie had included in the stipulation of facts a number of documents to which respondent had reserved objections and explained that these documents could not come into evidence unless they put on their case. They still wished to rest. The Court, on its own initiative, then examined the documents in question and admitted into evidence those for which there were no hearsay objections.

After trial respondent filed a motion to amend to conform the pleadings to the proof. The purpose of this motion was to revise Agent Chan's net worth calculation to correct two minor errors that came to light during her testimony. Specifically, respondent revised her calculation: (1) to move from 1999 to 2000, in determining Frank and Helen's net worth increases for those years, construction expenses of $7,268 on the Santa Barbara home and (2) to subtract, in determining Frank and Helen's AGI for 1999, an additional nontaxable item of $481. The revised deficiencies and fraud penalties for Frank and Helen are as follows:

| Year | Deficiency | Penalty sec. 6663 |
|------|-----------|-------------------|
| 1999 | $39,793 | $29,845 |
| 2000 | 174,327 | 130,745 |

**[\*20]** Because the Court instructed respondent to make these changes on the basis of the evidence heard at trial, we will grant respondent's motion.

OPINION

I.    Burden of Proof

The IRS' determinations in a notice of deficiency are generally presumed correct, and the taxpayer bears the burden of proving those determinations errone-ous.  Rule 142(a); Welch v. Helvering, 290 U.S. 111, 115 (1933).  For the pre-sumption to adhere in cases involving receipt of unreported income, the deficiency determination must be supported by "some evidentiary foundation linking the taxpayer to the alleged income-producing activity."  See Weimerskirch v. Com-missioner, 596 F.2d 358, 362 (9th Cir. 1979), rev'g 67 T.C. 672 (1977).  Once respondent has produced evidence linking the taxpayer to an income-producing activity, the burden of proof shifts to the taxpayer to prove by a preponderance of the evidence that respondent's determinations are arbitrary or erroneous.  Helver-ing v. Taylor, 293 U.S. 507, 515 (1935); Tokarski v. Commissioner, 87 T.C. 74 (1986).

To satisfy his initial burden of production, respondent introduced records that he obtained during the criminal investigation and the civil examination.  Those records establish that petitioners received during 1998-2000, but did not

[*21] report, substantial amounts of additional income from operation of White Sands. On the basis of this credible evidence, we are satisfied that the IRS' determinations as set forth in the notices of deficiency are entitled to the general presumption of correctness. See Hardy v. Commissioner, 181 F.3d 1002, 1004 (9th Cir. 1999) (deficiency determinations are entitled to presumption of correctness if the IRS relies on "substantive evidence that the taxpayer received unreported income"), aff'g T.C. Memo. 1997-97; Powerstein v. Commissioner, T.C. Memo. 2011-271.

As relevant here, the presumption of correctness is modified in one respect. Respondent in his answers asserted increased deficiencies as to Donald and Marie for 1999 and 2000, as to Frank for 1998, and as to Frank and Helen for 2000. Respondent bears the burden of proof as to these increased deficiencies. See Rule 142(a)(1). As explained more fully below, we find that respondent's position on all factual issues is supported by the preponderance of the evidence. The allocation of the burden of proof thus makes no difference.

II.    Analysis

A.    Net Worth Framework

Section 61(a) defines gross income as "all income from whatever source derived," including income derived from business. A taxpayer must maintain

**[*22]** books and records establishing the amount of his or her gross income. See

sec. 6001. When a taxpayer keeps no books of account or keeps books that are demonstrably inaccurate, the IRS may determine his income "under such method as, in the opinion of the Secretary, does clearly reflect income." Sec. 446(b); see Petzoldt v. Commissioner, 92 T.C. 661, 693 (1989). When a taxpayer fails to maintain or produce adequate records, the IRS may reconstruct his income using an indirect method of proof. Choi v. Commissioner, 379 F.3d 638, 639-640 (9th Cir. 2004), aff'g T.C. Memo. 2002-183.

The IRS has great latitude in reconstructing a taxpayer's income, and the reconstruction "need only be reasonable in light of all surrounding facts and circumstances." Petzoldt, 92 T.C. at 687. One method of reconstructing income, long recognized by courts as reasonable, is the net worth method. See Holland v. United States, 348 U.S. 121, 131 (1954). By its nature the net worth method seeks an approximation, rather than a precise determination, of the taxpayer's gross income. A lack of exactitude is inevitable where, as here, "[t]he * * * [IRS] was forced to use the imprecise net worth method of estimating income because the taxpayers' records were unreliable and did not accurately reflect income." United States v. Stonehill, 702 F.2d 1288, 1296 (9th Cir. 1983).

[*23] Under the net worth method the IRS reconstructs a taxpayer's income by determining his net worth (excess of assets at cost over liabilities) at the beginning and end of each year in issue. The difference between those amounts is the taxpayers' annual net worth increase (or decrease). The net worth increase for each year is then adjusted by adding nondeductible expenses (such as everyday living costs) and subtracting receipts from nontaxable sources (such as gifts, inheritances, and loans). See Holland, 348 U.S. at 125. An increase in net worth for a given year creates an inference of additional gross income for that year, provided that the IRS: (1) establishes the taxpayer's opening net worth with reasonable certainty and (2) either shows a likely source of unreported income or negates possible nontaxable sources. Id. at 132-138; Brooks v. Commissioner, 82 T.C. 413, 431-432 (1984), aff'd without published opinion, 772 F.2d 910 (9th Cir. 1985).[5]

In the instant cases petitioners failed to maintain accurate books or records from which their Federal tax liabilities could be computed. Frank admitted during

---

[5]Because the goal of the net worth method is to generate an approximation of the taxpayer's AGI for a given year, any itemized deductions claimed by the taxpayer, which serve to reduce AGI, are initially added back along with personal living expenses in order to calculate omitted gross income. See Brazwell v. Commissioner, T.C. Memo. 1992-463. After AGI is determined, taxable income is determined in the normal way by subtracting itemized deductions and allowing for personal exemptions.

**[\*24]** trial and in posttrial briefs that he failed to report at least $200,000 of income from White Sands. In their criminal tax case Donald and Marie stipulated that the tax loss attributable to their underreporting of income from White Sands was $210,628. Although this prior stipulation does not collaterally estop them from challenging the specific tax deficiencies asserted here, it does constitute an admission that their tax returns omitted substantial amounts of gross income. See Livingston v. Commissioner, T.C. Memo. 2000-121, 79 T.C.M. (CCH) 1828, 1833. Use of the net worth method is clearly proper where, as here, the "taxpayer's records do not accurately reflect income." United States v. Shetty, 130 F.3d 1324, 1331-1332 (9th Cir. 1997).

Petitioners do not question respondent's use of the net worth method to reconstruct their incomes for 1998-2000. They likewise do not challenge the analytical approach that Agent Chan adopted in implementing this methodology or the manner in which she resolved most subsidiary issues. Petitioners contest respondent's position on five main grounds. First, they contend that Agent Chan testified as an expert and that her testimony and exhibits were inadmissible because respondent did not follow Tax Court Rules regarding the submission of expert testimony. Second, petitioners contend that Agent Chan did not accurately calculate their net worths because she failed to take into account "cash hoards"

**[\*25]** that they allegedly derived from gifts and/or from operation of White Sands.

Third, Frank contends that the increase in his net worth derived in part from a

nontaxable source, namely, a loan from his parents. Fourth, Frank contends that

Agent Chan erred in determining that he was a 50% owner of White Sands.

Finally, Donald and Marie contend that the net worth calculation did not take into

account their outstanding liability for California sales tax. We address these

contentions below.

### B. Agent Chan's Testimony

Petitioners argue that Agent Chan testified as an expert by providing scien-

tific, technical, and specialized knowledge. See Fed. R. Evid. 702. Because

Agent Chan was not designated an expert and did not furnish an expert report as

required by Tax Court Rules, petitioners contend that her testimony should have

been ruled inadmissible. See Rule 143(g) (expert report); Rule 102 (continuing

duty to disclose expert). Respondent counters that "[i]n civil tax cases, especially

in unreported income cases, respondent's revenue agents testify, not as experts,

but rather to describe the methodology used by respondent to ascertain the

taxpayers' unreported income." We agree with respondent.[6]

---

[6]Petitioners also contend that Agents Broderick and Decker were improperly
allowed to testify as experts. There is no substance whatever to this argument.

(continued...)

**[\*26]** Rule 702 of the Federal Rules of Evidence defines an expert as a "witness who is qualified as an expert by knowledge, skill, experience, training, or education." An expert may testify in the form of an opinion or otherwise if her "scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence." Id. Conversely, a lay witness may not offer an opinion based on scientific, technical, or other specialized knowledge. Id. 701.

An IRS revenue agent who reconstructs a taxpayer's income and later testifies as to the methodology she employed generally is not an expert witness. For example, in Gudenschwager v. Commissioner, T.C. Memo. 1989-6, 56 T.C.M. (CCH) 1010, an IRS revenue agent determined the taxpayer's unreported income by using Bureau of Labor Statistics tables for a similarly sized family with an intermediate standard of living in the same metropolitan area. The taxpayer objected to the agent's testimony, asserting that she was not qualified as an expert to testify concerning the figures used. The Court overruled this objection:

> [T]he witness was not testifying as an expert when she described the methodology used by respondent to ascertain petitioner's unreported income. The witness testified regarding what methodology was used, not the validity of that methodology. Since the witness was not providing scientific, technical, or other specialized knowledge to assist

6(...continued)
Both agents testified solely as fact witnesses by recounting events that occurred during the criminal investigation of petitioners.

**[*27]** the court to understand the evidence in this case, rule 702 * * * is not applicable and the witness's testimony will not be treated as expert testimony.

Id., 56 T.C.M. (CCH) at 1012 (fn. ref. omitted).

We agree with the Court's reasoning in Gudenschwager.  Agent Chan did not offer any opinion based on scientific, technical, or other specialized knowledge.  Rather she testified as to the facts of the civil tax audit that she conducted, including the documents she collected, the interviews she held, and the observations she made.  She also explained in detail the methodology she followed, which is explicitly laid out in the Internal Revenue Manual (IRM).  See IRM pt. 4.10.4.6.7 (June 1, 2004).  In allowing her to testify, the Court repeatedly stated that her testimony would be accepted, not for the purpose of demonstrating the correctness of her methodology, but solely for the purpose of explaining what she did.  Because Agent Chan was not qualified as an expert and did not testify as an expert, respondent was not required to follow this Court's expert witness rules.[7]

---

[7]In United States v. Frantz, No. CR 02-01267(A)-MMM, 2004 WL 5642909, at *12 (C.D. Cal. Apr. 23, 2004), the District Court for the Central District of California held that:

[p]ursuant to Rule 701, * * * [the IRS agents] may explain their role as auditors and testify about how an audit is generally conducted. They may also testify to the documents and information they obtained, the research they conducted, the conversations they had,

(continued...)

**[\*28]** In the criminal tax context, "testimony by an IRS agent that allows the witness to apply the basic assumptions and principles of tax accounting to particular facts is appropriate." <u>United States v. Stierhoff</u>, 549 F.3d 19, 28 (1st Cir. 2008). Courts have held, and petitioners concede, that a lay summary witness may offer tax calculations if the calculations are "straightforward and transparent." <u>See, e.g.</u>, <u>United States v. Diez</u>, 515 F.2d 892, 905 (5th Cir. 1975); <u>United States v. Baras</u>, CR 11-00523 YGR, 2013 WL 6502846, at \*4 n.4 (N.D. Cal. Dec. 11, 2013). "The key to admissibility is that the summary witness's testimony does no more than analyze facts already introduced into evidence and spell out the tax consequences that necessarily flow from those facts." <u>Stierhoff</u>, 549 F.3d at 28.

In <u>Stierhoff</u>, a tax evasion case, the Government presented the testimony of IRS Agent Pleshaw as a summary witness. The defendant objected to Agent Pleshaw's testimony on the ground that he was not qualified as an expert. The Court of Appeals for the First Circuit disagreed, holding that Agent Pleshaw could testify as a summary witness to explain the "unremarkable" methodology, <u>id.</u> at 27, that he employed to reconstruct the taxpayer's income:

---

[7](...continued)
and the factual observations they made during the course of their audit, to the extent these matters are based on their rational perception of information and events, and do not rely on specialized or technical knowledge. \* \* \*

[*29] Using bank deposit records, Pleshaw computed the defendant's gross receipts * * *. He then set to one side non-taxable receipts (such as loan proceeds) and subtracted business expenses (treating all non-cash withdrawals from the defendant's accounts as deductible) * * *. To the 2002 total, he added the cash found during the search (which the defendant had admitted * * * emanated from his business dealings).

In that manner, Pleshaw arrived at an estimate of the defendant's net profits for each year. Thereafter, he adjusted for self-employment taxes, took the standard deduction, and factored in personal exemptions. These computations yielded the defendant's putative taxable income for each of the four years in question. * * *

The Court of Appeals held that the characterizations Agent Pleshaw had made en route to his conclusions, e.g., classifying receipts as "income" and with-drawals as "expenses," did not represent impermissible legal opinions, but rather "were part of a mechanical sorting of entries" under the methodology he had employed. Stierhoff, 549 F.3d at 28. The Court of Appeals concluded that it was within the District Court's discretion to allow Agent Pleshaw to testify without first qualifying him as an expert because he "simply did the math." Id. at 29.

We reach the same conclusion here. Agent Chan testified about facts and numerical data that were admitted into evidence, generally by stipulation. She testified as to the methodology she employed in reconstructing petitioners' incomes on the basis of these data. This methodology occasionally required her to characterize certain data, e.g., to break out cost basis, tax-deductible items, and

**[\*30]** nondeductible items from a real estate closing document. But in so doing she was not offering legal opinions. She was simply explaining the "mechanical sorting of entries" in which she engaged using the methodology she had employed. Stierhoff, 549 F.3d at 28.

Petitioners contend that the analysis set forth above "stems from case law that has been superseded by an amendment to the Federal Rules of Evidence." According to petitioners, before 2000 courts routinely allowed lay witnesses to offer opinion testimony in tax cases under rule 701 of the Federal Rules of Evidence. In 2000, however, that rule was amended to disallow lay opinion testimony that is based on "scientific, technical, or other specialized knowledge within the scope of Rule 702." See Fed. R. Evid. 701. This amendment required all opinion testimony based on a witness' scientific, technical, or other specialized knowledge to be rendered by a properly qualified expert. In petitioners' view, Gudenschwager and certain other cases cited above have been superseded by this amendment.

Petitioners are mistaken. Rule 701 of the Federal Rules of Evidence as amended disallows a lay witness' testimony only if it is "based on scientific, technical, or other specialized knowledge." The Court in Gudenschwager, 56 T.C.M. (CCH) at 1012, held that the IRS revenue agent who testified as a sum-

**[*31]** mary witness "was not providing scientific, technical, or other specialized knowledge"; that her testimony was therefore outside the scope of rule 702 of the Federal Rules of Evidence; and that her testimony "will not be treated as expert testimony."

The same conclusion follows here. Since Agent Chan's testimony was not based on scientific, technical, or other specialized knowledge, it fell outside the scope of rule 702 of the Federal Rules of Evidence. The 2000 amendment to rule 701 thus has no effect on the admissibility of her testimony or on the continuing vitality of the Gudenschwager line of cases. Under established caselaw Agent Chan was competent to testify as a summary witness to explain her implementation of the net worth method, and her testimony was properly admitted for that purpose.[8]

---

[8]Petitioners contend that Agent Chan's net worth schedules were inadmissible under Fed. R. Evid. 1006. We admitted these schedules as summary charts to assist the Court in evaluating the evidence because of the voluminous stipulated exhibits. See United States v. Anekwu, 695 F.3d 967, 981-982 (9th Cir. 2012) (holding that trial court did not abuse its discretion in admitting summary charts and underlying records into evidence). Petitioners also contend that the summary charts are inadmissible hearsay. They do not develop this argument, and the Court finds it meritless. All of the entries on Agent Chan's charts were linked to admissible evidence, and she testified about the math she employed in creating these charts on the basis of that evidence.

**[*32]** C.     Cash on Hand

Proper implementation of the net worth method requires the IRS to establish the taxpayer's opening net worth with reasonable certainty.  Holland, 348 U.S. at 132.  Donald and Marie contend that Agent Chan's analysis fails this threshold test because she did not give them credit for a large "cash hoard."  This contention is not without precedent.  "A favorite defense in net worth cases is that taxpayer had a large amount of undeposited cash on hand at the beginning of the investigation period.  This may explain the disproportionate increase in net worth over the increase of taxable income."  Schwarzkopf v. Commissioner, 246 F.2d 731, 734 (3d Cir. 1957), aff'g and remanding T.C. Memo. 1956-155; Light v. Commissioner, T.C. Memo. 1987-572.  The claim that a substantial cash hoard exists is often "met with some suspicion."  De Venney v. Commissioner, 85 T.C. 927, 933 (1985).  We are more than somewhat suspicious of petitioners' claims.

Donald and Marie allege that they had an undeposited cash hoard of about $200,000 at the end of 1997, supposedly resulting from a gift from Donald's father, Fred.  The evidence established, however, that Fred was not in a financial position to make such a gift.  According to SSA records Fred's total income during the 40-year period ending in 1977 was $185,430.  Fred retired in 1985 and moved into a federally subsidized housing unit for low-income seniors.  By 1986

[*33] his income consisted solely of Social Security and retirement payments totaling about $1,000 a month. This evidence was clearly sufficient to support the inference that Fred lacked the wherewithal to make a $200,000 cash gift to Donald and Marie. See United States v. Giacalone, 574 F.2d 328, 333 (6th Cir. 1978); McGarry v. United States, 388 F.2d 862 (1st Cir. 1967); Unger v. Commissioner, T.C. Memo. 2000-267. There was no evidence to support the existence of such a gift apart from Donald's testimony, which the Court did not find credible.

Frank makes a somewhat different argument concerning his alleged undeposited cash. He contends that he derived large amounts of cash from White Sands' operations and that Agent Chan's net worth analysis failed to take this into account. The principal support for Frank's "cash hoard" argument was his own testimony, which we did not find credible. Having observed his demeanor on the witness stand, we found him evasive and lacking in candor. We have considered his conviction for willfully making and subscribing to false returns as an additional factor bearing on his credibility.

Credibility apart, Frank's "cash hoard" argument has no support in the record. Although Frank used cash to pay White Sands' expenses, there is no evidence that he accumulated a cash hoard from White Sands' operations. Quite the contrary: Frank testified that he collected the daily receipts from the stores he

**[\*34]** managed, put them into a sealed envelope, and gave the envelope to his mother. The best evidence was that the store receipts constituting White Sands' profits were deposited by Marie or Donald into various bank accounts. There was no evidence that Frank "skimmed" profits from the stores he managed before delivering the sealed envelopes to Marie.

White Sands was a cash-intensive business, and petitioners kept substantial amounts of cash on hand to pay its vendors and expenses. Changes in these cash balances theoretically could affect annual changes in their net worths. But the records petitioners supplied, which were incomplete and often unreliable, did not enable Agent Chan to determine with any precision annual changes in cash balances. Petitioners can hardly complain of this. As the Court of Appeals for the Ninth Circuit put it: "Arithmetic precision was originally and exclusively in * * * [the taxpayer's] hands, and he had a statutory duty to provide it. * * * [H]aving defaulted in his duty, he cannot frustrate the Commissioner's reasonable attempts by compelling investigation and recomputation under every means of income determination." Adamson v. Commissioner, 745 F.2d 541, 548 (9th Cir. 1984) (quoting Webb v. Commissioner, 394 F.2d 366, 373 (5th Cir. 1968)), aff'g T.C. Memo. 1982-371.

[*35] For these reasons Agent Chan relied on the so-called dash method of accounting for undeposited cash.  Instead of trying to calculate annual cash balances, Agent Chan assumed that the amounts of cash petitioners kept on hand for use in their business were relatively constant from year to year.  In her net worth calculations, she accordingly placed a dash, or zero, in the column labeled "cash on hand."  As a result the annual change in petitioners' net worths was not affected, positively or negatively, by the undeposited cash they held.  Because it is impossible to ascertain, in unreported income situations, precisely how much cash a taxpayer has at any particular time, courts have consistently approved the use of the "dash method."  See Giacalone, 574 F.2d at 332-333; Roberts v. Commissioner, T.C. Memo. 1987-182; United States v. Goichman, 407 F. Supp. 980, 995 (E.D. Pa. 1976), aff'd, 547 F.2d 778 (3d Cir. 1976).  We conclude that Agent Chan established petitioners' opening net worths with reasonable certainty and that she properly accounted for the cash they kept on hand in subsequent years.

D.    Alleged Loans

Proper implementation of the net worth method requires the IRS to adjust annual net worth increases by subtracting amounts received from nontaxable sources, such as gifts, inheritances, and loans.  See Holland, 348 U.S. at 125, 137-138.  The Court of Appeals for the Ninth Circuit has not required the IRS to run

**[\*36]** down every conceivable rabbit hole when investigating leads about possible nontaxable receipts. Rather, "[t]he government must investigate and negate a taxpayer's explanation only if it is 'reasonable' and 'reasonably susceptible of being checked.'" United States v. Anderson, 642 F.2d 281, 285 (9th Cir. 1981) (quoting Holland, 348 U.S. at 135).

Frank contends that he "took out a variety of short-term personal loans from White Sands or his parents that were always repaid." A loan is "an agreement, either express or implied, whereby one person advances money to the other and the other agrees to repay it upon such terms as to time and rate of interest, or without interest, as the parties may agree." Calloway v. Commissioner, 135 T.C. 26, 36-37 (2010). A transfer of funds constitutes a loan only if, when the funds were advanced, the parties actually intended repayment. See Clark v. Commissioner, 266 F.2d 698, 710-711 (9th Cir. 1959), remanding T.C. Memo. 1957-129.

Agent Chan thoroughly investigated the transfers to Frank from his parents and determined that these transfers were not loans. There was no evidence whatsoever, apart from petitioners' uncorroborated testimony, that the sums trans-ferred were loans as opposed to a division of White Sands' profits. No promissory notes were executed. There was no evidence of a stated interest rate. There was

[*37] no instrument establishing a repayment schedule. And there was no evidence that Frank ever repaid his parents or that his parents ever sought repayment. We found Frank's testimony on this point to be vague, conclusory, and unworthy of belief. Considering all the facts and circumstances, we find that Agent Chan correctly determined that these transfers were not loans.

E.     Ownership of White Sands

Frank contends that Agent Chan erred in allocating half of White Sands' assets to him. Before the IRS criminal investigation began, Frank repeatedly represented himself as a coowner of White Sands to vendors, landlords, banks, lessors, insurance companies, municipal officials, and the State of California. During the criminal investigation Frank admitted in an interview with Agent Broderick that he was a 50% owner of White Sands. He reported White Sands' profits on his Schedules C, and its reported gross receipts and expenses were divided roughly 50-50 between his Schedules C and his parents' Schedules C. Considering all this evidence, Agent Chan reasonably concluded that 50% of White Sands' assets should be allocated to Frank.

Frank testified inconsistently on this point at trial. He initially asserted that he had no ownership interest in White Sands but was a mere employee. Confronted with the facts that White Sands did not pay him a regular salary and

[*38] never issued him a Form W-2, he admitted that he might have had some ownership interest in the business. He then suggested that his ownership interest was, at most, one-third, with the remaining two-thirds split between his parents. His testimony to this effect was impeached by his averment, in a 2001 filing with the California superior court, that his mother had no ownership interest in the business. All in all we find that the evidence conclusively supports Agent Chan's determination that 50% of White Sands' assets should be allocated to Frank for purposes of the net worth analysis.

F.      Reduction for Alleged Sales Tax Liabilities

Donald and Marie contend that Agent Chan erred, in determining their liabilities, by failing to consider their "unpaid, outstanding debts to the California State Board of Equalization." Donald and Marie presented no affirmative case at trial and introduced no evidence to establish the fact of these liabilities. The only evidence they point to is a one-page exhibit captioned "Sales Tax Schedule." This schedule is not an official BOE document and appears to have been created using a Microsoft Excel program. The evidence does not establish that these amounts were bona fide liabilities that were due but unpaid. Absent such proof, they have failed to show any error in Agent Chan's calculations.

**[\*39]** G.     Conclusion

Respondent has shown, by a preponderance of the evidence, that Agent Chan's net worth calculations were reasonable and free of arbitrariness and error. If anything, her calculations were generous to petitioners:  she resolved numerous doubts in their favor, and she made assumptions that uniformly tended to understate their AGIs.  She established petitioners' opening net worths with reasonable certainty; reasonably determined that White Sands was the likely source of their omitted income; and negated all plausible nontaxable sources of income.  Petitioners have identified no errors in her implementation of the net worth method, other than the minor errors that respondent conceded in his posttrial motion to amend to conform pleadings to proof.  As thus adjusted we sustain respondent's determinations of petitioners' unreported income for 1998, 1999, and 2000 and his assertions of increased deficiencies for certain of these years.

III.     Civil Fraud Penalty

Respondent determined fraud penalties against petitioners for 1998, 1999, and 2000.  Frank conceded the fraud penalties determined against him, and respondent does not contend that any of the underpayments were due to fraud perpetrated by Helen.  See sec. 6663(c) ("In the case of a joint return, this section shall not apply with respect to a spouse unless some part of the underpayment is

[*40] due to the fraud of such spouse."). Donald and Marie contest the fraud penalties determined against them. In their 2007 plea agreements Donald and Marie agreed that they were "liable for the civil fraud penalty imposed by the Internal Revenue Code * * * on the understatements of tax liability for 1998, 1999, and 2000." The evidence at trial clearly established that they are indeed liable for these fraud penalties.

"If any part of any underpayment of tax required to be shown on a return is due to fraud," section 6663(a) imposes a penalty of 75% of the portion of the underpayment due to fraud. Respondent has the burden of proving fraud, and he must prove it by clear and convincing evidence. Sec. 7454(a); Rule 142(b); Richardson v. Commissioner, 509 F.3d 736, 743 (6th Cir. 2007), aff'g T.C. Memo. 2006-69. To sustain his burden respondent must establish two elements: (1) that there was some underpayment of tax for each taxable year in issue; and (2) that at least some portion of the underpayment for each year was due to fraud. Hebrank v. Commissioner, 81 T.C. 640, 642 (1983). As explained above, respondent has carried his burden of proving that Donald and Marie underreported their income and underpaid their tax for 1998, 1999, and 2000. The remaining question is whether these underpayments were due to fraud.

**[*41]** Fraud is intentional wrongdoing designed to evade tax believed to be owing. Neely v. Commissioner, 116 T.C. 79, 86 (2001). The existence of fraud is a question of fact to be resolved upon consideration of the entire record. Estate of Pittard v. Commissioner, 69 T.C. 391, 400 (1977). Fraud is not to be presumed or based upon mere suspicion. Petzoldt, 92 T.C. at 699-700. However, because direct proof of a taxpayer's intent is rarely available, fraudulent intent may be established by circumstantial evidence. Grossman v. Commissioner, 182 F.3d 275, 277-278 (4th Cir. 1999), aff'g T.C. Memo. 1996-452.

Circumstances that may indicate fraudulent intent, commonly referred to as "badges of fraud," include but are not limited to: (1) understating income; (2) maintaining inadequate records; (3) giving implausible or inconsistent explanations of behavior; (4) concealing income or assets; (5) failing to cooperate with tax authorities; (6) engaging in illegal activities; (7) providing testimony that lacks credibility; (8) filing false documents, including false income tax returns; (9) failing to file tax returns; and (10) dealing extensively in cash. Spies v. United States, 317 U.S. 492, 499 (1943); Morse v. Commissioner, T.C. Memo. 2003-332, 86 T.C.M. (CCH) 673, 675, aff'd, 419 F.3d 829 (8th Cir. 2005). No single factor is dispositive; however, the existence of several factors "is persuasive

**[\*42]** circumstantial evidence of fraud." <u>Vanover v. Commissioner</u>, T.C. Memo. 2012-79, 103 T.C.M. (CCH) 1418, 1420-1421.

Donald and Marie pleaded guilty to willfully making and subscribing to a false tax return for 1998. In their plea agreement they admitted that the "mistakes" they made on their 1999 and 2000 returns were the same as those they had made on their 1998 return. While willfully making and subscribing to a false return does not in itself establish liability for the civil fraud penalty, such activity may properly be considered in connection with other facts in determining whether an underpayment of tax was due to fraud. See <u>Wright v. Commissioner</u>, 84 T.C. 636, 643-644 (1985); <u>Unger v. Commissioner</u>, T.C. Memo. 2000-267 (citing <u>Stoltzfus v. United States</u>, 398 F.2d 1002, 1004 (3d Cir. 1968)). Consistent and substantial understatement of income is itself evidence of fraud. See <u>Laurins v. Commissioner</u>, 889 F.2d 910, 913 (9th Cir. 1989), <u>aff'g</u> <u>Norman v. Commissioner</u>, T.C. Memo. 1987-265.

Numerous badges of fraud demonstrate that Donald and Marie intentionally evaded the payment of tax they knew to be owed. They substantially understated their income for all three years in issue. See <u>Stone v. Commissioner</u>, 56 T.C. 213, 214, 224-226 (1971). They maintained inadequate records. See <u>Ark. Oil & Gas, Inc. v. Commissioner</u>, T.C. Memo. 1994-497. They gave IRS agents inconsistent

[*43] explanations concerning ownership of White Sands and made false statements concerning their possession of its business records. See Morse, 419 F.3d at 833. Their testimony at trial lacked credibility concerning their alleged receipt of a $200,000 gift from Fred Worth. See Scott v. Commissioner, T.C. Memo. 2012-65, slip op. at 33. They dealt extensively in cash throughout the years in issue. See Evans v. Commissioner, T.C. Memo. 2010-199, aff'd, 507 Fed. Appx. 645 (9th Cir. 2013). They attempted to conceal assets by structuring bank deposits below the $10,000 threshold to avoid bank reporting to the IRS. See McClellan v. Commissioner, T.C. Memo. 2013-251, at *27-*28. And they filed a false income tax return for each year. See Potter v. Commissioner, T.C. Memo. 2014-18.

We find that the facts, taken as a whole, clearly and convincingly establish that Donald and Marie acted with fraudulent intent and that each of their underpayments of tax for 1998, 1999, and 2000 was due to fraud. We accordingly sustain respondent's imposition of the civil fraud penalty under section 6663(a) for each year.

**[*44]** To reflect the foregoing,

<u>An appropriate order and decision</u>

<u>will be entered</u>.