T.C. Memo. 2015-58

UNITED STATES TAX COURT

ALAA I. MUSA, Petitioner v.
COMMISSIONER OF INTERNAL REVENUE, Respondent

Docket No. 27996-12.                           Filed March 25, 2015.

Timothy L. Baldwin, for petitioner.

Michael T. Shelton and Elizabeth S. McBrearty, for respondent.

MEMORANDUM FINDINGS OF FACT AND OPINION

NEGA, Judge:  By notice of deficiency dated August 21, 2012, respondent

determined deficiencies in and penalties with respect to petitioner's Federal

income tax as follows:[1]

_____

[1]All monetary amounts are rounded to the nearest dollar.

| [*2]<br>Year | Deficiency | Penalty<br>sec. 6663(a) |
|---|---|---|
| 2006 | $106,899 | $80,174 |
| 2007 | 130,771 | 98,078 |
| 2008 | 146,981 | 110,236 |
| 2009 | 147,847 | 110,885 |
| 2010 | 96,166 | 72,125 |

After concessions, the issues remaining for decision are:

(1) whether petitioner is liable for the section 6663(a)[2] civil fraud penalty for tax years 2006-10, or in the alternative, whether petitioner is liable for the section 6662(a) accuracy-related penalty for tax years 2006-10 for any portions of the underpayments for those tax years for which the civil fraud penalty is not sustained;[3] and

(2) whether petitioner is entitled to additional deductions claimed on Schedule C, Profit or Loss From Business, in the following amounts and for the following types of expenses:

---

[2]All section references are to the Internal Revenue Code (Code) in effect for the years at issue. All Rule references are to the Tax Court Rules of Practice and Procedure.

[3]Petitioner stated in his pretrial memorandum that the sec. 6662(a) accuracy-related penalty "should be properly imposed on the Petitioner". The Court interprets this statement to mean that petitioner concedes he is liable for the sec. 6662(a) penalty if he is found not liable for the sec. 6663(a) civil fraud penalty.

| [*3] Year | Wages[1] | Nonemployee compensation | Vehicle | Meals & entertainment | Travel | Cost of goods sold |
|---|---|---|---|---|---|---|
| 2006 | --- | $37,700 | $8,460 | $685 | --- | --- |
| 2007 | --- | 37,700 | 8,584 | 1,651 | --- | --- |
| 2008 | --- | 65,866 | 4,329 | 3,005 | --- | --- |
| 2009 | --- | 79,484 | 3,300 | 2,758 | $7,589 | --- |
| 2010 | $75,900 | 75,875 | 4,782 | 3,414 | 478 | [2]$48,748 |

[1]Respondent filed a motion for partial summary judgment on March 4, 2014, which the Court granted by order dated March 27, 2014, and which we incorporate by reference. In our March 27, 2014, order, we agreed with respondent that the duty of consistency applies to prevent petitioner from deducting additional wages for tax years 2006-09 because the period of limitations for collection of employment tax for those periods has now expired, and respondent is barred by law from collecting the additional employment tax attributable to those wages. See sec. 6501(a), (b)(2); see also Kielmar v. Commissioner, 884 F.2d 959, 965 (7th Cir. 1989).

[2]Both petitioner and respondent refer to the proper treatment of additional cost of goods sold (COGS) as "deductions". The Court notes that COGS is not treated as a deduction from gross income but is rather subtracted from gross receipts in order to arrive at gross income. Metra Chem Corp. v. Commissioner, 88 T.C. 654, 661 (1987); sec. 1.61-3(a), Income Tax Regs.

## FINDINGS OF FACT

Some of the facts have been stipulated and are so found. Petitioner resided in Wisconsin at the time he filed his petition.

In 2005 petitioner formed Casablanca Restaurant, LLC (Casablanca), a single-member limited liability company formed in the State of Wisconsin. For

**[*4]** the years at issue petitioner reported Casablanca's income and expenses on Schedules C attached to his individual returns.

## I.  Casablanca's Operations

Casablanca used Micros Systems Inc. (Micros), an industry-standard point-of-sale system, to fulfill customers' food and drink orders.  Casablanca's staff entered customers' orders into computer terminals after entering in a four-digit personal identification number unique to each staff member.  The Micros computers then routed each order to the kitchen or bar, as applicable.  Additionally, each order was recorded by a central computer in an office below the restaurant.

At the end of an employee's shift the Micros system printed a "checkout report" that totaled the gross receipts from an individual waiter's shift, including bills paid by cash or credit card.  The checkout report indicated the amount of tip income due to a waiter, who would then receive an equivalent amount of cash.  Any remaining cash and the checkout reports were turned over to management.  During 2006 and 2007 petitioner printed daily sales reports from Micros and stapled the credit card receipts to each sales report.  For 2008, 2009, and 2010 petitioner generated only monthly sales reports.

[*5]    After closing the restaurant each night, petitioner stapled together and retained all of the credit card receipts in the event a customer paying by credit card disputed a transaction.  Credit card payments were automatically deposited into Casablanca's business operating account, ending in 1909, at U.S. Bank (operating account).  Petitioner threw away the cash receipts and checkout reports.  He generally took the cash received home with him each night and placed it in a safe in his residence.  During the years at issue petitioner never deposited more than a de minimis amount of Casablanca's cash receipts into the operating account or any other bank account.

The notice of deficiency determined significant adjustments to Casablanca's gross receipts as reported on the Schedules C.  Before trial the parties entered into a stipulation of settled issues where they agreed that Casablanca's gross receipts were underreported as follows:

| Year | Gross receipts per original return | Gross receipts per parties' agreement | Adjustment |
|------|------|------|------|
| 2006 | $369,021 | $799,463 | $430,442 |
| 2007 | 512,982 | 925,463 | 412,481 |
| 2008 | 584,189 | 1,047,560 | 463,371 |
| 2009 | 969,816 | 1,189,075 | 219,260 |
| 2010 | 1,244,407 | 1,339,458 | 95,051 |

[*6] II.    Casablanca's Payroll and Petitioner's Family Members

Petitioner hired Paychex, Inc. (Paychex), a leading national payroll provider, to provide payroll services for Casablanca. Paychex provided various services to Casablanca, including (1) withholding income tax for individual employees, (2) issuing Forms W-2, Wage and Tax Statement, and Forms W-3, Transmittal of Wage and Tax Statements, and (3) filing Forms 941, Employer's Quarterly Federal Tax Return. Each employee added to Casablanca's payroll completed a Form W-4, Employee's Withholding Allowance Certificate. Additionally, some employees completed Wisconsin Forms WT-4, Employee's Wisconsin Withholding Exemption Certificate/New Hire Reporting, if those employees elected different exemptions for State income tax purposes than for Federal tax purposes. Petitioner added employees to and removed employees from Casablanca's payroll by placing a telephone call to a Paychex representative and relaying the information on the completed Forms W-4 and/or Forms WT-4.

Petitioner provided Paychex with payroll information biweekly by calling a Paychex representative and relaying the payroll numbers over the telephone. Casablanca then transferred payroll funds from the operating account into a payroll account ending in 5754 at U.S. Bank. Paychex withdrew withholding

[*7] taxes and service fees from the payroll account and issued paychecks to employees who were on Casablanca's payroll.

Petitioner's immediate family[4] includes his parents, Issa (Jesse) and Fareezh, and eight siblings, brothers Ramzi, Nasser, Mohamad, and K.M.[5], and sisters Safaa, Intessar Hamdan, Hanaa, and Neveen. None of these family members appeared on Casablanca's payroll during 2006, 2007, or 2008. Nasser was added to the payroll on or about May 27, 2009, and remained on the payroll through at least the end of 2010. Ramzi was added to the payroll on or about October 12, 2010, and remained on the payroll through at least the end of 2010. Wage and income transcripts for Nasser and Ramzi reflect that Casablanca paid them $36,000 and $5,100, respectively, in 2010, which is consistent with the amounts reported on the Paychex records. Apart from Nasser and Ramzi, no other family members appeared on Casablanca's payroll in 2009 or 2010.

Petitioner claimed wage deductions of $207,150 on Casablanca's 2010 Schedule C, but the Paychex records reflect wages paid of only $131,250. Respondent disallowed the $75,900 difference. On or about November 25, 2013,

[4]Except for petitioner's sister Intessar Hamdan, all of petitioner's family members have the same surname as petitioner, Musa. For simplicity's sake, the Court will refer to petitioner's family members by their first names only.

[5]The Court refers to minor children by their initials.

[*8] Casablanca submitted an amended Form 941-X, Adjusted Employer's Quarterly Federal Tax Return or Claim for Refund, an amended Form 940, Employer's Annual Federal Unemployment (FUTA) Tax Return, amended Form W-2c, Corrected Wage and Tax Statements, and amended Form W-3c, Transmittal of Corrected Wage and Tax Statements. Petitioner claimed an additional $75,900 in wage deductions for tax year 2010. The additional wages claimed result from amended filings for Jesse, Nasser, and Ramzi reporting that for tax year 2010 Jesse was paid $15,000 instead of zero ($15,000 adjustment); Nasser was paid $65,000 instead of $36,000 ($29,000 adjustment); and Ramzi was paid $37,000 instead of $5,100 ($31,900 adjustment).

Nasser testified in this case on May 13, 2014. Respondent's attorney, Mr. Shelton, began cross-examining Nasser regarding wages he stated that he had received during the years at issue. After Nasser stated that he was aware that money he was paid in 2006 constituted wages, Mr. Shelton asked the Court to instruct Nasser on his Fifth Amendment rights against self-incrimination because an agent from the Internal Revenue Service Criminal Investigation Divison was present in the courtroom during Nasser's testimony. The Court complied with Mr. Shelton's request, and the Court recessed until May 14, 2014, to allow Nasser to obtain independent counsel. On May 14, 2014, counsel for both parties appeared

[*9] and informed the Court that several of petitioner's siblings, including Nasser, had retained Robert Dallman to represent their interests in petitioner's case. The Court deferred testimony from Nasser, Ramzi, and Neveen to allow Mr. Dallman time to familiarize himself with the facts of the case.

By order dated June 12, 2014, the case was calendared for further trial on August 5, 2014; but before the trial commenced, the parties filed a second supplemental stipulation of facts on August 4, 2014, that obviated the need for further trial. The second supplemental stipulation of facts states that Neveen worked at Casablanca in 2009 and Ramzi worked at Casablanca from 2007 to 2010, and further, that Neveen and Ramzi assert their Fifth Amendment rights to not answer the following questions:

> a. When you worked at C[asablanca] during the years at issue, were you aware that you were required to report all of your income to the IRS?

> b. Other than the returns that C[harles] S[turm] prepared for you in 2013, did you file any returns with the IRS that reported the income you say you received from C[asablanca] during the years at issue?

The second supplemental stipulation of facts also states that Nasser agreed with the above statements to the extent these statements would not be inconsistent with live testimony given during trial. As a result, neither Nasser nor Ramzi testified as to the amounts they received as compensation from Casablanca in 2010.

**[*10]** III.    Nonemployee Compensation

Petitioner claims additional deductions for nonemployee compensation of $37,700 for 2006, $37,700 for 2007, $65,866 for 2008, $79,484 for 2009, and $75,875 for 2010.  These claimed deductions are attributable to amounts paid to various individuals, including belly dancers, DJs, and unidentified individuals who were recruited to clean the restaurant.  Samantha Christensen is a belly dancer who has performed at Casablanca most Friday nights since October 2005.  She was paid $100 for each performance.  At some point in time, another belly dancer joined Ms. Christensen in performing on Friday nights, but it is unclear when the number of belly dancers increased from one to two.  Elijah Jansen is a former Casablanca bartender, server, and manager.  Mr. Jansen claims that Casablanca regularly recruited passersby to conduct various cleaning duties at Casablanca.  These individuals were paid in cash, but Mr. Jansen could not state whether Casablanca maintained records of the amounts paid to these individuals.  Yusuf Abbasi is a project manager at Caterpillar Coal Mining who has scheduled DJs to perform at Casablanca since September 2009.  Mr. Abbasi claims that the DJs perform every Thursday, Friday, and Saturday night and are paid $150 in cash for each performance.  Mr. Abbasi was not aware of any records that Casablanca kept for the amounts paid to the DJs.

[*11] IV.     Car and Truck, Meals and Entertainment, and Travel Expenses

Petitioner claims additional deductions for the following expenses in the following amounts:

| Year | Car and truck | Meals & entertainment | Travel |
|------|------|------|------|
| 2006 | $8,460 | $685 | --- |
| 2007 | 8,584 | 1,651 | --- |
| 2008 | 4,329 | 3,005 | --- |
| 2009 | 3,300 | 2,758 | $7,589 |
| 2010 | 4,782 | 3,414 | 478 |

Petitioner has not submitted any documentation that would substantiate these additional deductions.

V.     Cost of Goods Sold

Petitioner also claims he is entitled to an additional deduction of $48,748 for cost of goods sold for 2010.[6]  Petitioner's accountant, Charles Sturm, "pulled that number out of the blue" on the basis of his belief that COGS was lower for tax year 2010 than for prior years and therefore should have been increased by the

---

[6]As we note elsewhere in this opinion, COGS is not treated as a deduction from gross income but is rather subtracted from gross receipts to arrive at gross income.  Metra Chem Corp. v. Commissioner, 88 T.C. 654, 661 (1987); sec. 1.61-3(a), Income Tax Regs.

[*12] additional claimed amount. Mr. Sturm did not have any source documents that would substantiate the additional $48,748.

VI.    Casablanca's Accountants and Return Preparers

Petitioner hired J&M Accounting & Tax Services (J&M) in early 2006 to provide accounting and tax services for Casablanca. J&M is principally operated by Thomas Jobin. J&M provides accounting, tax return preparation, and payroll services for small- and medium-size businesses and prepares 2,000-2,500 tax returns per year. J&M prepared the following documents: (1) Casablanca's financial statements for 2006, 2007, 2008, and part of 2009; (2) petitioner's returns for tax years 2006, 2007, and 2008; and (3) Casablanca's State sales tax returns for 2006, 2007, and 2008.

J&M prepared monthly sales tax returns for Casablanca. Petitioner provided J&M with Casablanca's sales numbers monthly by telephone. Petitioner did not provide J&M with copies of the Micros daily sales reports until after the audit began in 2009. The sales numbers petitioner provided to J&M were far below actual sales as reflected on the Micros reports. For example, for January, February, and March 2006, J&M prepared sales tax returns reporting gross sales of $27,779, $21,931, and $27,542 respectively, while the Micros reports show gross sales of $75,256, $59,745, and $61,845 for those same months. These

[*13] discrepancies resulted in underreporting of sales tax collected by Casablanca and owed to the State of Wisconsin. For example, in January, February, and March 2006, petitioner collected $4,396, $3,486, and $3,610, respectively, but reported only $1,312, $1,036, and $1,341 to the State of Wisconsin. J&M used the monthly sales numbers that petitioner called in to prepare petitioner's Schedules C reporting Casablanca's gross receipts.

As a result, gross receipts for Casablanca were underreported by $430,442, $412,481, and $463,371 for 2006, 2007, and 2008, respectively, the years for which J&M prepared petitioner's individual income tax returns. J&M has a policy of reviewing tax returns with clients before filing, explaining important items such as gross receipts and cost of goods sold, and allowing clients to correct any errors on the return. Mr. Jobin credibly testified that J&M would have done the same with petitioner, and petitioner never informed anyone at J&M that the Schedules C were inaccurate.

In addition to misleading J&M about Casablanca's sales, petitioner did not disclose all of his bank accounts to J&M, including the bank account into which credit card payments were deposited and his personal account. Early in the relationship between Casablanca and J&M and before the audit, Mr. Jobin told petitioner that he should deposit Casablanca's cash receipts into a bank account,

[*14] but petitioner admitted at trial that he did not follow this advice. Mr. Jobin also told petitioner that all employees should be added to Casablanca's payroll, including petitioner's family members. Petitioner chose not to heed Mr. Jobin's advice in this regard. Additionally, Mr. Jobin told petitioner "early on" that he needed to keep records of business expenses, such as receipts and mileage logs.

Petitioner's cousin Jeff is a commercial relationship manager for PNC Bank in Milwaukee, Wisconsin. In early 2009 petitioner approached Jeff to ask for advice on purchasing the building housing Casablanca. When petitioner showed Jeff his tax returns, Jeff stated, he was "taken aback" by Casablanca's low profitability as reflected on the tax returns. Jeff asked petitioner whether he had other information regarding Casablanca's sales, at which point he showed Jeff the Micros reports. Jeff noticed discrepancies between the amounts tallied on the Micros reports and the amounts reported on petitioner's tax returns, and he suggested a meeting with J&M. Jeff had a preexisting relationship with Mr. Jobin, who had prepared Jeff's personal income tax returns. Petitioner and Jeff met with Mr. Jobin in early 2009, and Jeff stated that Mr. Jobin became "defensive" when questioned about the tax returns. Jeff explained that in his conversation with Mr. Jobin, he was "trying to understand where we're * * * missing * * * gross sales numbers off the [Micros] system back to the tax return". Following this meeting,

**[\*15]** Jeff suggested to petitioner that he switch accountants and referred him to Mr. Sturm, with whom Jeff had a preexisting business relationship. Jeff stated that it was "good practice" to refer clients to certain accountants, because they could be "a good referral source" in return. Petitioner did not follow Jeff's advice to hire Mr. Sturm until after he received notice that his returns were under audit.

In 2010 petitioner fired J&M and hired Charles Sturm & Associates (Sturm), led by Mr. Sturm. Sturm does a great deal of accounting work for restaurants and prepares approximately 1,400 individual tax returns annually. Sturm prepared petitioner's individual income tax returns for tax years 2009 and 2010 and prepared amended returns for petitioner for tax years 2006, 2007, and 2008. For all of the years at issue, petitioner failed to make any estimated tax payments.

Mr. Sturm did not believe the Micros reports were "completely reliable" but also stated that the credit card sales as reflected on the Micros reports matched deposits into petitioner's bank account. Rather than using the Micros reports, Mr. Sturm used the sales tax paid to the State of Wisconsin to reverse engineer the amounts of sales generated at Casablanca. Not all of the sales tax collected by Casablanca was remitted to the State of Wisconsin, and Mr. Sturm expressed his belief at trial that deductions are permitted for sales tax, even if that sales tax is not

[*16] paid over to the appropriate authority. Mr. Sturm admitted at trial that using this method of arriving at gross sales resulted in "significant" underreporting of Casablanca's gross receipts. The amended returns for 2006, 2007, and 2008 and the original returns for 2009 and 2010 that Mr. Sturm prepared all underreported Casablanca's gross receipts as reflected in the following table:

| Year | Amended and original returns filed by Mr. Sturm | Gross receipts per agreement of the parties | Adjustment |
|------|------|------|------|
| 2006 | $665,466 | $799,463 | $133,997 |
| 2007 | 781,170 | 925,463 | 144,293 |
| 2008 | 859,404 | 1,047,560 | 188,156 |
| 2009 | 969,816 | 1,189,075 | 19,260 |
| 2010 | 1,244,407 | 1,339,458 | 95,051 |

Part of the discrepancy between the amounts reported on the returns filed by Mr. Sturm and the amounts agreed to by the parties arose from the fact that petitioner told Mr. Sturm that he had paid some family members in cash, and as a result, Mr. Sturm increased the wage deduction attributable to Casablanca by "mental arithmetic". Mr. Sturm explained at trial that there was no paper trail to substantiate the increased wage deduction.

Petitioner did not disclose all of his bank accounts to Mr. Sturm. During trial Mr. Sturm could not identify more than 2 accounts attributable to petitioner,

[*17] but during the years at issue petitioner maintained 12 personal and business bank accounts. Like Mr. Jobin had done before him, Mr. Sturm told petitioner to deposit cash into the bank and add his family members to the payroll. Even after being advised by a second accountant as to these matters, petitioner did not immediately begin depositing cash into the bank or adding family members to the payroll.

VII.    Petitioner's Vehicle Loan Application

Petitioner applied for a $32,000 vehicle loan at U.S. Bank on April 27, 2007, to finance the purchase of a 2004 BMW 7 Series sedan. Petitioner submitted the application under Casablanca's name as a business loan. The loan application was processed by James Blomquist, who also serviced Casablanca's payroll and operating accounts at U.S. Bank. Petitioner purchased the car for personal reasons although he occasionally used it for business purposes. Petitioner did not keep any records of the times he used the car for business purposes.

The loan application was three pages long, with the first page containing information about the applicant, the second page containing signature lines, and the third page containing disclosures to the applicant. Petitioner represented on the loan application that Casablanca's gross annual sales as reported on his most

[*18] recent tax return were $720,000. Additionally, petitioner represented that his gross personal annual income as reported on his last income tax return was $240,000. Petitioner filed his 2006 individual Federal income tax return on April 15, 2007, which was 12 days before he applied for the vehicle loan at U.S. Bank. Petitioner's 2006 individual Federal income tax return reflects that he reported $369,021 in gross sales on the 2006 Schedule C for Casablanca, $18,324 in net profit for Casablanca, and $5,004 in gross income for himself.

## VIII. Audit

On June 5, 2009, respondent sent petitioner notice that his 2007 tax return was under audit. In August 2009 the audit was expanded to include petitioner's 2006 and 2008 tax returns. The audit was initially conducted by Revenue Agent Bryan Bannick but was reassigned to Revenue Agent Sharon Valentine (collectively, revenue agents) in January 2010 following Mr. Bannick's transfer to another IRS division.

During the course of the audit the revenue agents issued multiple information document requests (IDRs) to petitioner and his representatives, as illustrated in the following table:

[*19]

| Date issued | Recipient | Years covered |
|---|---|---|
| 7/7/09 | Alaa Musa | 2007 |
| 7/30/09 | Alaa Musa | 2007 |
| 8/12/09 | Alaa Musa | 2007 |
| 8/25/09 | Wilbert Bauer | 2006, 2007, 2008 |
| 11/5/09 | Alaa Musa | 2006, 2007, 2008 |
| 8/31/11 | Alaa Musa | 2006, 2007, 2008 |
| 9/27/11 | Alaa Musa & Charles Sturm | 2006 |
| 10/11/11 | Alaa Musa & Charles Sturm | 2007 |
| 10/11/11 | Alaa Musa & Charles Sturm | 2006 |
| 10/12/11 | Alaa Musa & Charles Sturm | 2009 |
| 11/29/11 | Alaa Musa & Charles Sturm | 2006, 2007, 2008, 2009, 2010 |
| 4/12/12 | Alaa Musa | 2006, 2007, 2008, 2009, 2010 |

Some of the IDRs were identical, except for the dates.  For example, the first three IDRs all requested the same information, and the 7/30/09 and 8/12/09 IDRs were reissued after petitioner failed to comply by the deadline in the 7/7/09 IDRs. Petitioner did not comply or only partially complied with many of the IDRs. Multiple IDRs requested bank statements, canceled checks, and deposit slips for petitioner's bank accounts, "both business and personal, savings and checking", but petitioner repeatedly failed to provide copies of various bank accounts,

[*20] including the payroll account and his personal account. Mr. Bannick eventually issued a summons to U.S. Bank to obtain petitioner's bank records.

Mr. Bannick and Ms. Valentine examined petitioner's bank account records and Micros reports and determined that he had failed to report significant amounts of gross receipts. Since petitioner rarely deposited cash into his bank accounts, the revenue agents could not use his bank account statements to determine the amounts of cash that were not reported on his tax returns. Instead, the revenue agents relied on Casablanca's Micros reports to determine the amounts of unreported cash. Ms. Valentine verified the accuracy of the Micros reports by comparing credit card transactions appearing on the Micros reports with credit card deposits into petitioner's bank account from 2006 to 10. Ms. Valentine's analysis found that the credit card transactions on the Micros reports matched the deposits into petitioner's bank account with a 1.39% variance. After confirming that the Micros reports accurately reflected the amounts of credit card sales, Ms. Valentine used the Micros reports to determine the amounts of unreported cash sales.

**[*21]**                                    OPINION

I.     Burden of Proof

Respondent bears the burden of proving fraud by clear and convincing evidence. See sec. 7454(a); Rule 142(b). To satisfy his burden, respondent must show: (1) an underpayment of tax exists, and (2) petitioner intended to evade taxes known to be owing by conduct intended to conceal, mislead, or otherwise prevent the collection of taxes. See Sadler v. Commissioner, 113 T.C. 99, 102 (1999); Parks v. Commissioner, 94 T.C. 654, 660-661 (1990). Fraud is never imputed or presumed, and therefore respondent must meet his burden through affirmative evidence. See Niedringhaus v. Commissioner, 99 T.C. 202, 210 (1992); Petzoldt v. Commissioner, 92 T.C. 661, 699 (1989); Beaver v. Commissioner, 55 T.C. 85, 92 (1970). Fraud may be proved by circumstantial evidence and reasonable inferences drawn from the facts because direct proof of a taxpayer's fraud is rarely available. Petzoldt v. Commissioner, 92 T.C. at 699. Once respondent has produced sufficient evidence to establish that any portion of the underpayment is attributable to fraud, the entire underpayment shall be treated as attributable to fraud, except with respect to any portion thereof that petitioner

**[\*22]** establishes, by a preponderance of the evidence, is not attributable to fraud. See sec. 6663(b).

Petitioner bears the burden of proving his entitlement to the claimed Schedule C deductions. Respondent's determination as to petitioner's tax liability is presumed correct, and petitioner bears the burden of proving otherwise. See Rule 142(a); Welch v. Helvering, 290 U.S. 111, 115 (1933). Exclusions from income are to be narrowly construed. Commissioner v. Schleier, 515 U.S. 323, 328 (1995). Deductions are a matter of legislative grace. Deputy v. du Pont, 308 U.S. 488, 493 (1940); New Colonial Ice Co. v. Helvering, 292 U.S. 435, 440 (1934). Taxpayers must comply with specific requirements for any deductions claimed. See INDOPCO, Inc. v. Commissioner, 503 U.S. 79, 84 (1992); New Colonial Ice Co. v. Helvering, 292 U.S. at 440. Taxpayers must also maintain adequate records to substantiate the amounts of any credits and deductions. Sec. 6001; sec. 1.6001-1(a), Income Tax Regs.

Section 7491(a)(1) provides an exception that shifts the burden of proof to the Commissioner as to any factual issue relevant to a taxpayer's liability if: (1) the taxpayer introduces credible evidence with respect to that issue, and (2) the

**[\*23]** taxpayer satisfies other conditions, including substantiation of any item and cooperation with the Government's requests for witnesses, documents, other information, and meetings.  Sec. 7491(a)(2); see also Rule 142(a)(2).  The taxpayer bears the burden of proving that he or she has met the requirements of section 7491(a).  Rolfs v. Commissioner, 135 T.C. 471, 483 (2010), aff'd, 668 F.3d 888 (7th Cir. 2012).  It is unclear from petitioner's briefs whether he has asserted burden shifting under section 7491(a).  However, petitioner has not demonstrated that the requirements of section 7491(a) have been met, and therefore the burden of proof with respect to the claimed Schedule C deductions remains with petitioner.

II.    Section 6663(a) Fraud Penalty

If any part of any underpayment of tax required to be shown on a return is attributable to fraud, section 6663(a) imposes a penalty equal to 75% of the portion of the underpayment which is attributable to fraud.  Section 6663(b) provides that once the Commissioner establishes that any portion of the underpayment is due to fraud, the entire underpayment is to be treated as

[*24] attributable to fraud except with respect to any portion that the taxpayer establishes, by a preponderance of the evidence, is not attributable to fraud.

### A.    Underpayment of Tax

The first prong of the fraud test requires the Commissioner to prove that, for each year at issue, there is an underpayment of tax. The parties have stipulated that petitioner failed to report significant sums of gross receipts from Casablanca for each year at issue. As explained in further detail infra, petitioner is allowed additional Schedule C deductions of $5,200 for tax years 2006, 2007, and 2008, and $28,600 for tax years 2009 and 2010 for nonemployee compensation. Apart from these deductions, petitioner is not entitled to any additional deductions. After taking into account the additional Schedule C deductions to which petitioner is entitled, an underpayment exists for each of the tax years at issue.

### B.    Fraudulent Intent

The second prong of the fraud test requires the Commissioner to prove that, for each year at issue, at least some portion of the underpayment is due to fraud, defined as an intentional wrongdoing designed to evade tax believed to be owing. DiLeo v. Commissioner, 96 T.C. 858, 874 (1991), aff'd, 959 F.2d 16 (2d Cir.

**[*25]** 1992).  The existence of fraud is a question of fact to be resolved from the entire record.  Gajewski v. Commissioner, 67 T.C. 181, 199 (1976), aff'd without published opinion, 578 F.2d 1383 (8th Cir. 1978).  Fraud is never imputed or presumed.  Beaver v. Commissioner, 55 T.C. at 92; Otsuki v. Commissioner, 53 T.C. 96, 112 (1969).  The Court may examine the taxpayer's whole course of conduct to determine whether fraud exists.  Stone v. Commissioner, 56 T.C. 213, 224 (1971).  There is rarely direct evidence of a taxpayer's fraudulent intent, and the Commissioner may prove fraudulent intent through circumstantial evidence.  Toushin v. Commissioner, 223 F.3d 642, 647 (7th Cir. 2000), aff'g T.C. Memo. 1999-171.

Over the years, courts have developed a nonexclusive list of factors that demonstrate fraudulent intent.  These badges of fraud include:  (1) understatement of income, (2) inadequate maintenance of records, (3) implausible or inconsistent explanations of behavior, (4) concealment of assets or income, (5) failure to cooperate with tax authorities, (6) engaging in illegal activities, (7) an intent to mislead which may be inferred from a pattern of conduct, (8) lack of credibility of the taxpayer's testimony, (9) failure to file tax returns, (10) filing false documents,

[*26] (11) failure to make estimated tax payments, and (12) dealing in cash. See

Spies v. United States, 317 U.S. 492, 499 (1943); Bradford v. Commissioner, 796

F.2d 303, 307-308 (9th Cir. 1986), aff'g T.C. Memo. 1984-601; Niedringhaus v.

Commissioner, 99 T.C. at 211. A taxpayer's intelligence, education, and tax

expertise are relevant for purposes of determining fraudulent intent. See

Stephenson v. Commissioner, 79 T.C. 995, 1006 (1982), aff'd, 748 F.2d 331 (6th

Cir. 1984); Iley v. Commissioner, 19 T.C. 631, 635 (1952). We consider several

of these factors in turn.

### 1. Understatement of Income

Petitioner has conceded that he underreported gross receipts totaling more

than $1.6 million during the years at issue, and as a result he underreported his

own income. Petitioner argues that the underreporting of income was not

intentional but was instead due to carelessness and recklessness, which he argues

negates a finding of fraudulent intent. Petitioner attempts to blame Mr. Jobin for

the inaccuracies in his tax returns by arguing that Mr. Jobin had access to his

financial records and the Micros reports but for some unspecified reason chose to

underreport petitioner's income.

**[\*27]** We find petitioner's arguments to be unconvincing for several reasons. First, Mr. Jobin credibly testified that he did not see the Micros reports until after the commencement of audit and further, petitioner failed to disclose all of his bank accounts to Mr. Jobin. Petitioner does not offer any explanation as to why Mr. Jobin or J&M would be motivated to prepare grossly inaccurate returns. Additionally, petitioner cannot escape the duty to file accurate returns by shifting the blame to Mr. Jobin and J&M. See Metra Chem Corp. v. Commissioner, 88 T.C. at 662 ("As a general rule, the duty of filing accurate returns cannot be avoided by placing responsibility on a tax return preparer."). Second, the underreporting continued after petitioner changed accountants and enlisted Sturm to prepare his tax returns. Consistent failure to report substantial income over several years is highly persuasive evidence of fraudulent intent. See Temple v. Commissioner, T.C. Memo. 2000-337, aff'd, 62 Fed. Appx. 605 (6th Cir. 2003). Petitioner's failure to report substantial income over a five-year period is an indication of fraud.

[*28]      2.      Inadequate Maintenance of Records

Petitioner admitted at trial to the following:  (1) destroying cash sales receipts, (2) excluding his family members from payroll and paying them in cash, for which he kept no records, (3) failing to keep any records relating to amounts paid in cash to janitors and performers, (4) failing to keep any records relating to vehicle expenses, and (5) failing to keep records for claimed travel, meals, and entertainment expenses.

Petitioner's petition alleged that the Micros reports were "unreliabl[e]" and "un-reconciled" and therefore that respondent's reliance on them to reconstruct petitioner's gross income was "illogical and erroneous".  However, petitioner now argues that he failed to keep cash receipts because the Micros reports captured all of the incoming sales and thus there was no need to keep records of cash sales. Respondent correctly points out the inconsistency in petitioner's arguments regarding the Micros reports.  Petitioner's explanation for throwing away cash receipts is unconvincing given his prior assertions that the Micros reports could not be trusted.  Petitioner also attempts to explain his destruction of cash sales records by arguing that keeping records of cash sales would have been too

[*29] onerous, because doing so would have required "dozens upon dozens" of boxes. Petitioner's testimony on this point seems hyperbolic, given that his testimony reflects that credit card receipts from the five years at issue filled only eight boxes in his office.

As to his failure to put his family members on the payroll, petitioner argues that he paid family members in cash because (1) it is a common practice in the restaurant industry, (2) other employees were also not included on the payroll, and (3) some family members suffered from gambling addictions and he wished to control their cashflow. Additionally, petitioner argues that he could not have had the requisite intent to evade taxes since putting his family members on the payroll would have afforded him additional deductions for wages paid. These arguments are unconvincing. Other employees were paid in cash but only after being added to the payroll. Even if we accept as true that certain family members suffered from gambling addictions, this does not explain petitioner's failure to keep records of cash wages paid to those family members. Finally, while petitioner would have been entitled to deductions for cash wages that were actually paid to his family members, his argument ignores that documenting deductions for amounts paid to

[*30] family members would have created a paper trail for those individuals, many of whom did not report income during the years at issue or reported income lower than what he now claims they were paid. Petitioner did not offer any explanation as to why he did not keep records of amounts paid to the belly dancers, DJs, and itinerant workers.

Petitioner also offers insufficient explanations for his failure to keep records relating to vehicle, travel, and meals and entertainment expenses. He argues that, since "[r]espondent has presented no alternative method to dispute legitimate ordinary and necessary business expenses", petitioner should be entitled to deduct these expenses. This argument ignores that the burden of proving entitlement to deductions falls to petitioner.

In sum, petitioner's failure to keep records relating to cash receipts, amounts paid in cash to family members and other workers, and deductions claimed for various section 274(d) expenses supports a finding of fraud.

**[\*31]**       3.       <u>Implausible or Inconsistent Explanations of Behavior</u>

Petitioner proffered numerous implausible and inconsistent explanations as to why his failure to report significant amounts of income for the years at issue does not rise to the level of fraud. In his petition, petitioner stated that he believed the Micros reports to be "unreliabl[e]" as an indicator of Casablanca's gross sales, but at trial and in posttrial briefing, petitioner characterized Micros as being "very solid" because it "captured all sales transactions". These explanations are inconsistent with each another.

Petitioner also attempts to paint a picture of himself as a "young man with no business acumen" whose failure to report income was due to inexperience and naivete rather than a fraudulent intent to evade taxes. Petitioner testified that he did not understand tax returns, the Micros reports, or the difference between gross and net sales, and as a result he relied on his accountant to help him comply with his tax reporting requirements. Petitioner places the blame for the inaccurate tax returns squarely on the shoulders of his first accountant, Mr. Jobin. These explanations are implausible for several reasons. First, petitioner understood the requirement to report all of his income, but he did not give Mr. Jobin accurate

[*32] sales numbers over the phone, nor did he give Mr. Jobin the Micros reports or information about all of his bank accounts. If petitioner truly wished to seek the help of a seasoned accountant, he would not have intentionally misled Mr. Jobin about Casablanca's sales. Second, the sales numbers petitioner reported by telephone, which he attributes to a misunderstanding between gross and net sales, do not match any of the amounts appearing on the Micros reports.[7] Third, if petitioner truly were an inexperienced young man who relied on his accountants for guidance, he chose to follow their advice somewhat selectively, given that he did not deposit cash into the bank or add his family members to payroll after being told repeatedly by both Mr. Jobin and Mr. Sturm to do so. Finally, the fact that petitioner continued to underreport his income for tax years 2009 and 2010 after changing accountants directly undercuts his argument that Mr. Jobin was at fault for the inaccurate returns, particularly after Jeff Musa purportedly made petitioner

---

[7]For example, for January 2008 petitioner filed a sales tax return with the State of Wisconsin that reported $48,226 in total sales, but the Micros report for that month reflects net sales of $63,726 and gross receipts of $78,534. There is no figure on the January 2008 Micros report that matches the $48,226 figure given to the State of Wisconsin on petitioner's sales tax return.

[*33] aware of discrepancies in the returns that Mr. Jobin prepared. This factor favors a finding of fraudulent intent.

### 4.    Concealment of Assets or Income

Petitioner concealed his income from both his accountants and the IRS. Petitioner admitted to taking cash from Casablanca home with him at the end of each day and rarely depositing any of it into the bank. Both Mr. Jobin and Mr. Sturm told petitioner to deposit cash into the bank, advice which he chose not to follow during the years at issue. Mr. Sturm testified at trial that it is still a "struggle" to convince petitioner to deposit cash.

Petitioner also relayed false sales numbers over the phone to Mr. Jobin. It is well established that a failure to provide one's accountant with complete records is an indication of fraud. Korecky v. Commissioner, 781 F.2d 1566, 1568-1569 (11th Cir. 1986), aff'g per curiam T.C. Memo. 1985-63. Petitioner again attempts to blame Mr. Jobin for underreporting Casablanca's income, by claiming that (1) he gave Mr. Jobin all of the Micros reports and (2) Mr. Jobin had access to his bank statements in order to prepare his tax returns and Casablanca's Schedule C. Mr. Jobin testified at trial that he had never seen the "bank account into which the

[*34] credit cards were being deposited into" but that he did receive bank statements, albeit late, relating to the "operating account". It is unclear from the record for which bank account, if any, Mr. Jobin saw statements, because the parties have stipulated that the bank account ending in 1909 at U.S. Bank is the "operating account". A review of the Micros reports and bank records for the operating account reveals that amounts from credit card charges at Casablanca were deposited into the operating account. However, Mr. Jobin's testimony is credible in the light of the following: (1) Casablanca retained 11 bank accounts during the years at issue, in addition to petitioner's personal account, (2) neither Mr. Jobin nor Mr. Sturm was aware of more than two of these accounts, and (3) petitioner's petition states that he gave Mr. Jobin "reconciled bank statements" by petitioner. It is believable that Mr. Jobin saw some portion of the bank statements relating to 1 of the 11 accounts, but petitioner's failure to provide Mr. Jobin with statements for all business accounts affiliated with Casablanca is evidence of an intent to conceal income and/or assets from his accountant.

Further, even if Mr. Jobin had access to all of the bank records, petitioner's failure to deposit more than a de minimis amount of cash into the bank means that

[*35] his bank statements do not accurately reflect Casablanca's income and could not have been relied on by Mr. Jobin in preparing petitioner's tax returns. Petitioner's testimony that Mr. Jobin had all of the Micros reports is simply not credible, because (1) he has not identified any reason why Mr. Jobin would misreport Casablanca's sales tax numbers, (2) the amounts reflected on the Micros reports do not match with any sales numbers reported to the State of Wisconsin, and (3) underreporting of income continued after he switched accountants.

Petitioner also financed a luxury vehicle under Casablanca's name, even though he admitted he had sufficient cash to purchase the vehicle outright. Using a business account to purchase or hold personal assets is indicative of fraud. See Branson v. Commissioner, T.C. Memo. 2012-124 (citing Benes v. Commissioner, 42 T.C. 358, 383 (1964), aff'd, 355 F.2d 929 (6th Cir. 1966)).

In addition to concealing his own income and assets, petitioner assisted his family in concealing income if he did in fact pay them in cash and not report corresponding amounts on Forms W-2. Assisting others in concealing income can be indicative of fraudulent intent. Watson v. Commissioner, T.C. Memo. 1988-29.

**[*36]** In sum, petitioner's concealment of income from the IRS and his accountants, his financing of a vehicle under his business' name, and his aid to others in concealing their income is highly probative of fraud.

### 5. Failure To Cooperate With Tax Authorities

Petitioner did not cooperate with tax authorities during the audit. The revenue agents were forced to issue multiple IDRs for the same information after petitioner failed to provide the requested documents in a timely manner. Although many of the IDRs requested new information, several were identical because of petitioner's failure to comply with earlier IDRs. Further, petitioner repeatedly failed to provide his bank records, despite requests for statements for all of his accounts, "both business and personal, savings and checking". Mr. Bannick had to resort to issuing a bank summons to obtain petitioner's complete bank records. Failure to comply with IDRs is indicative of fraudulent intent. See, e.g., McClellan v. Commissioner, T.C. Memo. 2013-251 (stating that revenue agent issued six IDRs); McKenna v. Commissioner, T.C. Memo. 1998-45 (stating that three IDRs were issued); Pau v. Commissioner, T.C. Memo. 1997-43 (stating that failure to produce books and records in response to one IDR was indicative of

[*37] fraudulent intent); see also Good v. Commissioner, T.C. Memo. 2012-323 (finding lack of cooperation where revenue agent was forced to summon taxpayer's bank records).

6.      Failure To File Tax Returns

Respondent argues that petitioner failed to file tax returns when he failed to submit Forms W-2 and Forms 1099-MISC, Miscellaneous Income, on behalf of family members and nonemployee contractors who were paid in cash. Respondent further argues that petitioner failed to file amended tax returns by waiting to file amended Forms 941-X until 2013 and 2014 after purportedly discovering the errors in 2012.

The Code does not generally require taxpayers to file amended returns. See Badaracco v. Commissioner, 464 U.S. 386, 397 (1984). Taxpayers may choose to file amended returns to correct errors on original returns, but such action is not generally mandated by the Code or the regulations. See, e.g., Storey v. Commissioner, T.C. Memo. 2012-115, 103 T.C.M. (CCH) 1631,1637 (2012) (finding filing an amended return to be permissive, rather than mandatory).

**[*38]** Petitioner filed original tax returns that were grossly inaccurate, but he nevertheless filed tax returns. The failure to file amended returns does not support a finding of intent to evade taxes. See Taylor v. Commissioner, T.C. Memo. 1997-513.

However, petitioner was required to file Forms W-2 and Forms 1099-MISC for all employees but failed to do so for several individuals, including family members who were paid in cash. This failure is indicative of fraudulent intent. See Hi-Q Personnel, Inc. v. Commissioner, 132 T.C. 279 (2009) (finding fraudulent intent where employer paid employees in cash and failed to file Forms W-2 or Forms 1099-MISC for them). On balance, we find that petitioner's failure to file Forms W-2 and Forms 1099-MISC supports a finding of fraudulent intent under this factor.

### 7. Filing False Documents

While we recognize that petitioner did file tax returns, those original returns underreported Casablanca's gross receipts and his income by more than $1.6 million. The amended returns also significantly underreported his gross receipts and income. Filing false documents includes filing false income tax returns.

[*39] <u>Worth v. Commissioner</u>, T.C. Memo. 2014-232; <u>Potter v. Commissioner</u>, T.C. Memo. 2014-18; <u>Morse v. Commissioner</u>, T.C. Memo. 2003-332, <u>aff'd</u>, 419 F.3d 829 (8th Cir. 2005). Petitioner also filed false employment tax returns when he failed to report wages purportedly paid in cash to family members.

Aside from filing false documents with the IRS, petitioner also misled third parties. Petitioner admits that he did not add his family members to the payroll maintained by Paychex. Consequently, Casablanca's payroll did not accurately capture employment data for all employees, which in turn meant that Forms W-2 and Forms 1099-MISC filed for certain individuals were either incorrect or nonexistent.

Further, petitioner submitted a false document to U.S. Bank when he signed an application for a car loan wherein he materially misstated both his personal income and Casablanca's gross annual sales as reported on his last tax return. At trial petitioner attempted to shift blame to a bank employee by testifying that Mr. Blomquist had filled out the loan application using information based on bank deposits into Casablanca's operating account. Mr. Blomquist did not testify, and petitioner did not offer any evidence to corroborate his own self-serving testimony

[*40] on this point. However, even accepting as true that it was Mr. Blomquist, and not petitioner, who filled out the loan application, petitioner represented that the information contained therein was correct when he signed the second page of the three-page application.

Petitioner's filing of multiple false documents, including false income tax returns, false employment tax returns, false payroll reporting, and a false loan application, supports a finding of fraud.

### 8. Failure To Make Estimated Tax Payments

Petitioner failed to make any estimated tax payments for 2006, 2007, 2008, 2009, or 2010. Section 6654(d)(1)(A) requires quarterly installment payments of 25% of the required annual payment. The required annual payment is the lesser of 90% of the tax due for the year or 100% of the tax shown on the preceding year's return. Sec. 6654(d)(1)(B). Petitioner's failure to make any estimated tax payments for the years at issue is indicative of fraudulent intent.

**[*41]**        9.      <u>Dealing in Cash</u>

Petitioner dealt extensively in cash during all of the years at issue. He

admitted to never depositing more than a de minimis amount of cash into the bank.

Petitioner claims that his family members, performers, and itinerant street workers

were all paid in cash, but he kept no records of any amounts paid in cash to these

individuals. Nor did he keep receipts for business expenses he now claims were

paid in cash. Dealing in cash is evidence of fraudulent intent "because it

demonstrates a desire to avoid detection of income-producing activities."

<u>Powerstein v. Commissioner</u>, T.C. Memo. 2011-271 (citing <u>Bradford v.

Commissioner</u>, 796 F.2d at 308); <u>see also</u> <u>McClellan v. Commissioner</u>, T.C.

Memo. 2013-251 (using cash to pay employees in excess of reported payroll

wages was evidence of fraudulent intent).

     C.      <u>Conclusion</u>

In sum, multiple badges of fraud are present. For all taxable years at issue,

petitioner: (1) underreported his income, (2) maintained inadequate records, (3)

concealed income and assets from both his accountants and the IRS, (4) failed to

file Forms W-2 and Forms 1099-MISC, (5) filed false documents, (6) failed to

**[*42]** make estimated tax payments, and (7) dealt extensively in cash. During the audit petitioner failed to cooperate with revenue agents. Finally, he has offered inconsistent and implausible explanations to the IRS and to the Court for his behavior. Considering all of the facts and circumstances, we find that petitioner is liable for the section 6663 civil fraud penalty for each year at issue. Consequently, the entire amount of the underpayment for each taxable year at issue is attributable to fraud. Petitioner has not shown that any portion of any underpayment is not due to fraud. See sec. 6663(b).

III.    Claimed Schedule C Deductions

Petitioner argues he is entitled to additional deductions for (1) wages paid to family members for 2010, (2) nonemployee compensation paid for all years at issue, (3) vehicle expenses for all years at issue, (4) meals and entertainment expenses for all years at issue, (5) travel expenses for 2009 and 2010, and (6) cost of goods sold for 2010. Under the Cohan rule, where a taxpayer is able to demonstrate that he or she has paid or incurred a deductible expense but cannot substantiate the precise amount, the Court may estimate the amount of the expense if the taxpayer produces credible evidence providing a reasonable basis for the

**[\*43]** Court to do so.  <u>Cohan v. Commissioner</u>, 39 F.2d 540, 544 (2d Cir. 1930);

<u>Vanicek v. Commissioner</u>, 85 T.C. 731, 743 (1985).  The Court is not permitted to

use the <u>Cohan</u> rule to estimate certain expenses under section 274, and the

taxpayer must strictly substantiate such expenditures.  Sec. 274(d).

Petitioner did not substantiate the additional wage deduction claimed for

2010 for amounts purportedly paid to Jesse, Nasser, and Ramzi.  None of the

named individuals testified as to the amounts they received during those years.

Further, wage and income transcripts and Paychex records do not substantiate the

additional wages.  Petitioner offers only his own self-serving testimony that he

paid his father and brothers an additional $75,900 for which he now claims

entitlement to a deduction.  The Court requires some basis on which an estimate

under the <u>Cohan</u> rule may be made.  <u>Vanicek v. Commissioner</u>, 85 T.C. at 743

(citing <u>Williams v. United States</u>, 245 F.2d 559 (5th Cir. 1957)).  Petitioner has

not provided evidence upon which we may base such an estimate for wages paid

to Jesse, Nasser, and Ramzi, and accordingly, he is denied any additional

deduction for wages paid in 2010.

**[*44]** Petitioner also claims deductions for nonemployee compensation paid to belly dancers, DJs, and itinerant workers hired to clean Casablanca during the years at issue. At trial Ms. Christensen credibly testified that she was paid $100 for belly dancing most Friday nights at Casablanca beginning in 2005. Ms. Christensen did not state when another dancer began performing alongside her. Accordingly, bearing heavily against the taxpayer whose inexactitude is of his own making, we allow petitioner an additional deduction of $5,200 for each year at issue for the amounts paid to Ms. Christensen. Similarly, Mr. Abbasi credibly testified that petitioner paid DJs $150 for performing on Thursday, Friday, and Saturday nights. However, Mr. Abbasi was not hired to coordinate the DJs until 2009, and the Court cannot rely on his testimony for taxable years for which he does not have firsthand knowledge. Accordingly, petitioner is allowed an additional deduction of $23,400 for both 2009 and 2010. Mr. Jansen's testimony did not give the Court a reliable basis upon which to estimate the amounts paid to itinerant cleaners, and petitioner's failure to keep records of these amounts leads us with no choice but to deny any additional deductions claimed for amounts paid to these individuals.

[*45] Petitioner also claims deductions for expenses relating to vehicles, meals and entertainment, and travel during the years at issue. Petitioner must strictly substantiate these amounts under section 274(d); the Court is not permitted to use the Cohan rule to estimate such expenses. See sec. 274(d). Petitioner has not offered any substantiating documents for these expenses but rather alleges that "account books (ledgers) were provided to the Agent during the course of the examination". It appears petitioner is arguing his provision of documents to the revenue agents during the audit is sufficient to substantiate his expenses under section 274(d). Moreover, petitioner's petition indicates that he had other copies of the account books and ledgers that he provided to respondent before trial, but he failed to provide copies of these documents to the Court. Petitioner has not come close to meeting the substantiation requirements under section 274(d), and he is not entitled to any additional deductions for the claimed vehicle, meals and entertainment, and travel expenses.

Finally, petitioner claims an additional deduction for tax year 2010 for COGS. As noted elsewhere in this opinion, COGS is subtracted from gross receipts to arrive at gross income and therefore not treated as deductions from

[*46] gross income.  Metra Chem Corp. v. Commissioner, 88 T.C. at 661; sec.

1.61-3(a), Income Tax Regs.  Petitioner and respondent entered into a stipulation

of settled issues before trial wherein they reached an agreement on gross receipts

for tax year 2010.  Assuming arguendo that petitioner did not concede the

additional claimed COGS when he stipulated Casablanca's 2010 gross receipts,

we find that he has not substantiated the additional claimed costs.  Mr. Sturm

testified at trial that this number was pulled "out of the blue" and has no basis in

reality.  Accordingly, petitioner is not entitled to an adjustment for COGS for

2010.

In reaching our holdings, we have considered all arguments made, and, to

the extent not mentioned above, we conclude they are moot, irrelevant, or without

merit.

To reflect the foregoing,

Decision will be entered

under Rule 155.